# ABOOD ET AL. *v.* DETROIT BOARD OF EDUCATION ET AL.

No. 75–1153.   Argued November 9, 1976—Decided May 23, 1977

*Sylvester Petro* argued the cause for appellants. With him on the briefs was *John L. Kilcullen.*

*Theodore Sachs* argued the cause and filed a brief for appellees.*

MR. JUSTICE STEWART delivered the opinion of the Court.

The State of Michigan has enacted legislation authorizing a system for union representation of local governmental employees. A union and a local government employer are specifically permitted to agree to an "agency shop" arrangement, whereby every employee represented by a union—even though not a union member—must pay to the union, as a condition of employment, a service fee equal in amount to union dues. The issue before us is whether this arrangement violates the constitutional rights of government employees who object to public-sector unions as such or to various union activities financed by the compulsory service fees.

I

After a secret ballot election, the Detroit Federation of Teachers (Union) was certified in 1967 pursuant to Michigan

---

*Ronald A. Zumbrun* and *John H. Findley* filed a brief for the Pacific Legal Foundation as *amicus curiae* urging reversal.

*Robert H. Chanin* and *David Rubin* filed a brief for the National Education Assn. as *amicus curiae* urging affirmance.

law as the exclusive representative of teachers employed by the Detroit Board of Education (Board).[1] The Union and the Board thereafter concluded a collective-bargaining agreement effective from July 1, 1969, to July 1, 1971. Among the agreement's provisions was an "agency shop" clause, requiring every teacher who had not become a Union member within 60 days of hire (or within 60 days of January 26, 1970, the effective date of the clause) to pay the Union a service charge equal to the regular dues required of Union members. A teacher who failed to meet this obligation was subject to discharge. Nothing in the agreement, however, required any teacher to join the Union, espouse the cause of unionism, or participate in any other way in Union affairs.

On November 7, 1969—more than two months before the agency-shop clause was to become effective—Christine Warczak and a number of other named teachers filed a class action in a state court, naming as defendants the Board, the Union, and several Union officials. Their complaint, as amended, alleged that they were unwilling or had refused to pay dues [2] and that they opposed collective bargaining in

---

[1] The certification was authorized by Mich. Comp. Laws § 423.211 (1970), which provides:

"Representatives designated or selected for purposes of collective bargaining by the majority of the public employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the public employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment or other conditions of employment, and shall be so recognized by the public employer: Provided, That any individual employee at any time may present grievances to his employer and have the grievances adjusted, without intervention of the bargaining representative, if the adjustment is not inconsistent with the terms of a collective bargaining contract or agreement then in effect, provided that the bargaining representative has been given opportunity to be present at such adjustment."

[2] Some of the plaintiffs were Union members and were paying agency-shop fees under protest; others had refused either to pay or to join the Union; still others had joined the Union and paid the fees without any

the public sector. The amended complaint further alleged that the Union "carries on various social activities for the benefit of its members which are not available to non-members as a matter of right," and that the Union is engaged

> "in a number and variety of activities and programs which are economic, political, professional, scientific and religious in nature of which Plaintiffs do not approve, and in which they will have no voice, and which are not and will not be collective bargaining activities, i. e., the negotiation and administration of contracts with Defendant Board, and that a substantial part of the sums required to be paid under said Agency Shop Clause are used and will continue to be used for the support of such activities and programs, and not solely for the purpose of defraying the cost of Defendant Federation of its activities as bargaining agent for teachers employed by Defendant Board." [3]

The complaint prayed that the agency-shop clause be declared invalid under state law and also under the United States Constitution as a deprivation of, *inter alia,* the plaintiffs' freedom of association protected by the First and Fourteenth Amendments, and for such further relief as might be deemed appropriate.

Upon the defendants' motion for summary judgment, the trial court dismissed the action for failure to state a claim upon which relief could be granted.[4] *Warczak* v. *Board of*

---

apparent protest. The agency-shop clause itself prohibits the discharge of an employee engaged in litigation concerning his service charge obligation until his legal remedies have been exhausted, and no effort to enforce the clause against any of the plaintiffs has been made.

[3] The nature of these activities and of the objections to them were not described in any further detail.

[4] A grant of summary judgment under Mich. Gen. Ct. Rule 117.2 (1) is equivalent to dismissal under Fed. Rule Civ. Proc. 12 (b) (6) for failure

*Education,* 73 LRRM 2237 (Cir. Ct. Wayne County). The plaintiffs appealed, and while their appeal was pending the Michigan Supreme Court ruled in *Smigel* v. *Southgate Community School Dist.,* 388 Mich. 531, 202 N. W. 2d 305, that state law prohibited an agency shop in the public sector. Accordingly, the judgment in the *Warczak* case was vacated and remanded to the trial court for further proceedings consistent with the *Smigel* decision.

Meanwhile, D. Louis Abood and other named teachers had filed a separate action in the same state trial court. The allegations in the complaint were virtually identical to those in *Warczak,*[5] and similar relief was requested.[6] This second action was held in abeyance pending disposition of the *Warczak* appeal, and when that case was remanded the two cases were consolidated in the trial court for consideration of the defendants' renewed motion for summary judgment.

On November 5, 1973, that motion was granted. The trial court noted that following the *Smigel* decision, the Michigan Legislature had in 1973 amended its Public Employment Relations Act so as expressly to authorize an agency shop. 1973 Mich. Pub. Acts, No. 25, codified as Mich. Comp. Laws § 423.210 (1)(c).[7] This amendment was applied retro-

---

to state a claim upon which relief can be granted. See *Bielski* v. *Wolverine Ins. Co.,* 379 Mich. 280, 150 N. W. 2d 788; *Hiers* v. *Brownell,* 376 Mich. 225, 136 N. W. 2d 10; *Handwerk* v. *United Steelworkers of America,* 67 Mich. App. 747, 242 N. W. 2d 514; *Crowther* v. *Ross Chem. & Mfg. Co.,* 42 Mich. App. 426, 202 N. W. 2d 577.

[5] The only material difference was that *Abood* was not a class action.

[6] The *Abood* complaint prayed for declaratory and injunctive relief against discharge of any teacher for failure to pay the service charge, and for such other relief as might be deemed appropriate.

[7] That section provides in relevant part:

"[N]othing in this act or in any law of this state shall preclude a public employer from making an agreement with an exclusive bargaining representative as defined in section 11 to require as a condition of employment that all employees in the bargaining unit pay to the

actively by the trial court to validate the agency-shop clause predating 1973 as a matter of state law, and the court ruled further that such a clause does not violate the Federal Constitution.

The plaintiffs' appeals were consolidated by the Michigan Court of Appeals, which ruled that the trial court had erred in giving retroactive application to the 1973 legislative amendment. The appellate court proceeded, however, to consider the constitutionality of the agency-shop clause, and upheld its facial validity on the authority of this Court's decision in *Railway Employes' Dept.* v. *Hanson,* 351 U. S. 225, which upheld the constitutionality under the First Amendment of a union-shop clause, authorized by the Railway Labor Act, requiring financial support of the exclusive bargaining representative by every member of the bargaining unit. *Id.,* at 238. Noting, however, that Michigan law also permits union expenditures for legislative lobbying and in support of political candidates, the state appellate court identified an issue explicitly not considered in *Hanson*—the constitutionality of using compulsory service charges to further "political purposes" unrelated to collective bargaining. Although recognizing that such expenditures "could violate plaintiffs' First and Fourteenth Amendment rights," the court read this Court's more recent decisions to require that an employee who seeks to vindicate such rights must "make known to the union those causes and candidates to which he objects." Since the complaints had failed to allege that any such notification had been given, the court held that the plaintiffs were not entitled to restitution of any portion of the service charges. The trial court's error on the retroactivity question, however, led the appellate court to reverse and remand

exclusive bargaining representative a service fee equivalent to the amount of dues uniformly required of members of the exclusive bargaining representative . . . ."

the case.[8]  60 Mich. App. 92, 230 N. W. 2d 322.  After the Supreme Court of Michigan denied review, the plaintiffs appealed to this Court, 28 U. S. C. § 1257 (2), and we noted probable jurisdiction, 425 U. S. 949.[9]

[8] The purpose of the remand was not expressly indicated.  The trial court had entered judgment for the defendants upon the ground that the complaint failed to state a claim on which relief could be granted.  The state appellate court's ruling that the 1973 amendment was not to be given retroactive effect did not undermine the validity of the trial court's judgment, for the Court of Appeals' determination that any possibly meritorious claims raised by the plaintiffs were prematurely asserted required the same result as that ordered by the trial court.  The remand "as to the retroactive application given to [the 1973 amendment]" must, therefore, have been only for a ministerial purpose, such as the correction of language in the trial court's judgment for the defendants.  In these circumstances, the judgment of the Court of Appeals is final for purposes of 28 U. S. C. § 1257 (2).  See, e. g., Pope v. Atlantic Coast Line R. Co., 345 U. S. 379, 382; Republic Natural Gas Co. v. Oklahoma, 334 U. S. 62, 67–68; Richfield Oil Corp. v. State Bd. of Equalization, 329 U. S. 69, 72–74.

[9] At oral argument the suggestion was made that this case might be moot.  The only agency-shop clause placed in issue by the complaints was contained in a collective-bargaining agreement that expired in 1971.  That clause was unenforceable as a matter of state law after the decision in Smigel and the ruling of the State Court of Appeals in the present cases that the 1973 statute should not be given retroactive application.

But both sides acknowledged in their briefs submitted to the Michigan Court of Appeals that a successor collective-bargaining agreement effective in 1973 contained substantially the identical agency-shop provision.  The Court of Appeals appears to have taken judicial notice of this agreement in rendering its decision, for otherwise its ruling that the 1973 amendment was not retroactive would have disposed of the case without the need to consider any constitutional questions.  Since the state appellate court considered the 1973 agreement to be part of the record in making its ruling, we proceed upon the same premise.

The fact that the 1973 agreement may have expired since the state appellate court rendered its decision does not affect the continuing vitality of this controversy for Art. III purposes.  Some of the plaintiffs in both Warczak and Abood either refused to pay the service charge or paid it under protest.  See n. 2, supra.  Their contention that they cannot

## II

### A

Consideration of the question whether an agency-shop provision in a collective-bargaining agreement covering governmental employees is, as such, constitutionally valid must begin with two cases in this Court that on their face go far toward resolving the issue. The cases are *Railway Employes' Dept.* v. *Hanson, supra,* and *Machinists* v. *Street,* 367 U. S. 740.

In the *Hanson* case a group of railroad employees brought an action in a Nebraska court to enjoin enforcement of a union-shop agreement.[10] The challenged clause was author-

constitutionally be compelled to contribute the service charge, or at least some portion of it, thus survives the expiration of the collective-bargaining agreement itself.

[10] Under a union-shop agreement, an employee must become a member of the union within a specified period of time after hire, and must as a member pay whatever union dues and fees are uniformly required. Under both the National Labor Relations Act and the Railway Labor Act, "[i]t is permissible to condition employment upon membership, but membership, insofar as it has significance to employment rights, may in turn be conditioned only upon payment of fees and dues." *NLRB* v. *General Motors,* 373 U. S. 734, 742. See 29 U. S. C. § 158 (a)(3); 45 U. S. C. § 152 Eleventh, quoted in n. 11, *infra.* Hence, although a union shop denies an employee the option of not formally becoming a union member, under federal law it is the "practical equivalent" of an agency shop, *NLRB* v. *General Motors, supra,* at 743. See also *Lathrop* v. *Donohue,* 367 U. S. 820, 828.

*Hanson* was concerned simply with the requirement of financial support for the union, and did not focus on the question whether the additional requirement of a union-shop arrangement that each employee formally join the union is constitutionally permissible. See *NLRB* v. *General Motors, supra,* at 744 ("Such a difference between the union and agency shop may be of great importance in some contexts . . ."); cf. *Storer* v. *Brown,* 415 U. S. 724, 745–746. As the agency shop before us does not impose that additional requirement, we have no occasion to address that question.

ized, and indeed shielded from any attempt by a State to prohibit it, by the Railway Labor Act, 45 U. S. C. § 152 Eleventh.[11] The trial court granted the relief requested. The Nebraska Supreme Court upheld the injunction on the ground that employees who disagreed with the objectives promoted by union expenditures were deprived of the freedom of association protected by the First Amendment. This Court agreed that "justiciable questions under the First and Fifth Amendments were presented," 351 U. S., at 231,[12]

---

[11] In relevant part, that section provides:

"Notwithstanding any other provisions of this chapter, or of any other statute or law of the United States, or Territory thereof, or of any State, any carrier or carriers as defined in this chapter and a labor organization or labor organizations duly designated and authorized to represent employees in accordance with the requirements of this chapter shall be permitted—

"(a) to make agreements, requiring, as a condition of continued employment, that within sixty days following the beginning of such employment, or the effective date of such agreements, whichever is the later, all employees shall become members of the labor organization representing their craft or class: *Provided,* That no such agreement shall require such condition of employment with respect to employees to whom membership is not available upon the same terms and conditions as are generally applicable to any other member or with respect to employees to whom membership was denied or terminated for any reason other than the failure of the employee to tender the periodic dues, initiation fees, and assessments (not including fines and penalties) uniformly required as a condition of acquiring or retaining membership."

[12] Unlike § 14 (b) of the National Labor Relations Act, 29 U. S. C. § 164 (b), the Railway Labor Act pre-empts any attempt by a State to prohibit a union-shop agreement. Had it not been for that federal statute, the union-shop provision at issue in *Hanson* would have been invalidated under Nebraska law. The *Hanson* Court accordingly reasoned that government action was present: "[T]he federal statute is the source of the power and authority by which any private rights are lost or sacrificed. . . . The enactment of the federal statute authorizing union shop agreements is the governmental action on which the Constitution operates . . . ." 351 U. S., at 232. See also *id.,* at 232 n. 4 ("Once courts enforce the agreement the sanction of government is, of course, put behind

but reversed the judgment of the Nebraska Supreme Court on the merits. Acknowledging that "[m]uch might be said *pro* and *con*" about the union shop as a policy matter, the Court noted that it is Congress that is charged with identifying "[t]he ingredients of industrial peace and stabilized labor-management relations . . . ." *Id.,* at 233–234. Congress determined that it would promote peaceful labor relations to permit a union and an employer to conclude an agreement requiring employees who obtain the benefit of union representation to share its cost, and that legislative judgment was surely an allowable one. *Id.,* at 235.

The record in *Hanson* contained no evidence that union dues were used to force ideological conformity or otherwise to impair the free expression of employees, and the Court noted that "[i]f 'assessments' are in fact imposed for purposes not germane to collective bargaining, a different problem would be presented." *Ibid.* (footnote omitted). But the Court squarely held that "the requirement for financial support of the collective-bargaining agency by all who receive the benefits of its work . . . does not violate . . . the First . . . Amendmen[t]." *Id.,* at 238.

The Court faced a similar question several years later in the *Street* case, which also involved a challenge to the constitutionality of a union shop authorized by the Railway Labor Act. In *Street,* however, the record contained findings that the union treasury to which all employees were required to contribute had been used "to finance the campaigns of candidates for federal and state offices whom [the plaintiffs] opposed, and to promote the propagation of political and economic doctrines, concepts and ideologies with which [they] disagreed." 367 U. S., at 744.

The Court recognized, *id.,* at 749, that these findings presented constitutional "questions of the utmost gravity" not

---

them. See *Shelley* v. *Kraemer,* 334 U. S. 1; *Hurd* v. *Hodge,* 334 U. S. 24; *Barrows* v. *Jackson,* 346 U. S. 249").

decided in *Hanson,* and therefore considered whether the Act could fairly be construed to avoid these constitutional issues. 367 U. S., at 749–750.[13] The Court concluded that the Act could be so construed, since only expenditures related to the union's functions in negotiating and administering the collective-bargaining agreement and adjusting grievances and disputes fell within "the reasons . . . accepted by Congress why authority to make union-shop agreements was justified," *id.,* at 768. The Court ruled, therefore, that the use of compulsory union dues for political purposes violated the Act itself. Nonetheless, it found that an injunction against enforcement of the union-shop agreement as such was impermissible under *Hanson,* and remanded the case to the Supreme Court of Georgia so that a more limited remedy could be devised.

The holding in *Hanson,* as elaborated in *Street,* reflects familiar doctrines in the federal labor laws. The principle of exclusive union representation, which underlies the National Labor Relations Act [14] as well as the Railway Labor Act, is a central element in the congressional structuring of industrial relations. *E. g., Emporium Capwell Co.* v. *Western Addition Community Org.,* 420 U. S. 50, 62–63; *NLRB* v. *Allis-Chalmers Mfg. Co.,* 388 U. S. 175, 180; *Medo Corp.* v. *NLRB,* 321 U. S. 678, 684–685; *Virginian R. Co.* v. *System Federation No. 40,* 300 U. S. 515, 545–549. The designation of a single representative avoids the confusion that would result from attempting to enforce two or more agreements specifying different terms and conditions of employment. It prevents inter-union rivalries from creating

---

[13] In suggesting that *Street* "significantly undercut," and constituted a "rethinking" of, *Hanson, post,* at 247, the opinion concurring in the judgment loses sight of the fact that the record in *Street,* unlike that in *Hanson,* potentially presented constitutional questions arising from union expenditures for ideological purposes unrelated to collective bargaining.

[14] 29 U. S. C. § 151 *et seq.*

dissension within the work force and eliminating the advantages to the employee of collectivization. It also frees the employer from the possibility of facing conflicting demands from different unions, and permits the employer and a single union to reach agreements and settlements that are not subject to attack from rival labor organizations. See generally *Emporium Capwell Co. v. Western Addition Community Org., supra,* at 67–70; S. Rep. No. 573, 74th Cong., 1st Sess., 13 (1935).

The designation of a union as exclusive representative carries with it great responsibilities. The tasks of negotiating and administering a collective-bargaining agreement and representing the interests of employees in settling disputes and processing grievances are continuing and difficult ones. They often entail expenditure of much time and money. See *Street,* 367 U. S., at 760. The services of lawyers, expert negotiators, economists, and a research staff, as well as general administrative personnel, may be required. Moreover, in carrying out these duties, the union is obliged "fairly and equitably to represent all employees . . . , union and non-union," within the relevant unit. *Id.,* at 761.[15] A union-

---

[15] See *Hines v. Anchor Motor Freight, Inc.,* 424 U. S. 554, 564:

"Because '[t]he collective bargaining system as encouraged by Congress and administered by the NLRB of necessity subordinates the interests of an individual employee to the collective interests of all employees in a bargaining unit,' *Vaca v. Sipes,* 386 U. S. 171, 182 (1967), the controlling statutes have long been interpreted as imposing upon the bargaining agent a responsibility equal in scope to its authority, 'the responsibility and duty of fair representation.' *Humphrey v. Moore, supra,* at 342. The union as the statutory representative of the employees is 'subject always to complete good faith and honesty of purpose in the exercise of its discretion.' *Ford Motor Co. v. Huffman,* [345 U. S. 330, 338]. Since *Steele v. Louisville & N. R. Co.,* 323 U. S. 192 (1944), with respect to the railroad industry, and *Ford Motor Co. v. Huffman, supra,* and *Syres v. Oil Workers,* 350 U. S. 892 (1955), with respect to those industries reached by the National Labor Relations Act, the duty of fair representation has served as a 'bulwark to prevent arbitrary union

shop arrangement has been thought to distribute fairly the cost of these activities among those who benefit, and it counteracts the incentive that employees might otherwise have to become "free riders"—to refuse to contribute to the union while obtaining benefits of union representation that necessarily accrue to all employees. *Ibid.;* see *Oil Workers* v. *Mobil Oil Corp.,* 426 U. S. 407, 415–416; *NLRB* v. *General Motors,* 373 U. S. 734, 740–741.

To compel employees financially to support their collective-bargaining representative has an impact upon their First Amendment interests. An employee may very well have ideological objections to a wide variety of activities undertaken by the union in its role as exclusive representative. His moral or religious views about the desirability of abortion may not square with the union's policy in negotiating a medical benefits plan. One individual might disagree with a union policy of negotiating limits on the right to strike, believing that to be the road to serfdom for the working class, while another might have economic or political objections to unionism itself. An employee might object to the union's wage policy because it violates guidelines designed to limit inflation, or might object to the union's seeking a clause in the collective-bargaining agreement proscribing racial discrimination. The examples could be multiplied. To be required to help finance the union as a collective-bargaining agent might well be thought, therefore, to interfere in some way with an employee's freedom to associate for the advancement of ideas, or to refrain from doing so, as he sees fit.[16] But the judgment clearly made in *Hanson* and *Street* is that such interference as exists is constitutionally justified by the legislative assessment of the important contribution of the union shop to the system of labor relations established by Congress. "The

conduct against individuals stripped of traditional forms of redress by the provisions of federal labor law.' *Vaca* v. *Sipes, supra,* at 182."

[16] See *infra,* at 233–235.

furtherance of the common cause leaves some leeway for the leadership of the group. As long as they act to promote the cause which justified bringing the group together, the individual cannot withdraw his financial support merely because he disagrees with the group's strategy. If that were allowed, we would be reversing the *Hanson* case, *sub silentio.*" *Machinists* v. *Street*, 367 U. S., at 778 (Douglas, J., concurring).

## B

The National Labor Relations Act leaves regulation of the labor relations of state and local governments to the States. See 29 U. S. C. § 152 (2). Michigan has chosen to establish for local government units a regulatory scheme which, although not identical in every respect to the NLRA or the Railway Labor Act,[17] is broadly modeled after federal law. *E. g., Rockwell* v. *Crestwood School Dist. Bd. of Ed.*, 393 Mich. 616, 635–636, 227 N. W. 2d 736, 744–745, appeal dismissed *sub nom. Crestwood Ed. Assn.* v. *Board of Ed. of Crestwood*, 427 U. S. 901; *Detroit Police Officers Assn.* v. *Detroit*, 391 Mich. 44, 53, 214 N. W. 2d 803, 807–808; *Michigan Employment Relations Comm'n* v. *Reeths-Puffer School Dist.*, 391 Mich. 253, 260, and n. 11, 215 N. W. 2d 672, 675, and n. 11. Under Michigan law employees of local government units enjoy rights parallel to those protected under federal legislation: the rights to self-organization and to bargain collectively, Mich. Comp. Laws §§ 423.209, 423.215 (1970); see 29 U. S. C. § 157; 45 U. S. C. § 152 Fourth; and the right to secret-ballot representation elections, Mich. Comp. Laws § 423.212 (1970); see 29 U. S. C. § 159 (e)(1); 45 U. S. C. § 152 Ninth.

Several aspects of Michigan law that mirror provisions of the Railway Labor Act are of particular importance here. A union that obtains the support of a majority of employees

---

[17] See, *e. g., infra*, at 229.

in the appropriate bargaining unit is designated the exclusive representative of those employees. Mich. Comp. Laws § 423.211 (1970).[18]   A union so designated is under a duty of fair representation to all employees in the unit, whether or not union members. *E. g., Lowe* v. *Hotel & Restaurant Employees Local 705,* 389 Mich. 123, 145–152, 205 N. W. 2d 167, 177–180; *Wayne County Community College Federation of Teachers Local 2000* v. *Poe,* 1976 Mich. Emp. Rel. Comm'n 347, 350–353; *Local 836, AFSCME* v. *Solomon,* 1976 Mich. Emp. Rel. Comm'n 84, 89.   And in carrying out all of its various responsibilities, a recognized union may seek to have an agency-shop clause included in a collective-bargaining agreement. Mich. Comp. Laws § 423.210 (1) (c) (1970). Indeed, the 1973 amendment to the Michigan law[19] was specifically designed to authorize agency shops in order that "employees in the bargaining unit . . . share fairly in the financial support of their exclusive bargaining representative . . . ." § 423.210 (2).

The governmental interests advanced by the agency-shop provision in the Michigan statute are much the same as those promoted by similar provisions in federal labor law. The confusion and conflict that could arise if rival teachers' unions, holding quite different views as to the proper class hours, class sizes, holidays, tenure provisions, and grievance procedures, each sought to obtain the employer's agreement, are no different in kind from the evils that the exclusivity rule in the Railway Labor Act was designed to avoid. See *Madison School Dist.* v. *Wisconsin Employment Relations Comm'n,* 429 U. S. 167, 178 (BRENNAN, J., concurring in judgment).   The desirability of labor peace is no less important in the public sector, nor is the risk of "free riders" any smaller.

Our province is not to judge the wisdom of Michigan's

---

[18] See n. 1, *supra.*

[19] See *supra,* at 214, and n. 7.

decision to authorize the agency shop in public employment.[20] Rather, it is to adjudicate the constitutionality of that decision. The same important government interests recognized in the *Hanson* and *Street* cases presumptively support the impingement upon associational freedom created by the agency shop here at issue. Thus, insofar as the service charge is used to finance expenditures by the Union for the purposes of collective bargaining, contract administration, and grievance

---

[20] See *Hanson*, 351 U. S., at 233–234 (footnote omitted):

"Powerful arguments have been made here that the long-run interests of labor would be better served by the development of democratic traditions in trade unionism without the coercive element of the union or the closed shop. Mr. Justice Brandeis, who had wide experience in labor-mangement relations prior to his appointment to the Court, wrote forcefully against the closed shop. He feared that the closed shop would swing the pendulum in the opposite extreme and substitute 'tyranny of the employee' for 'tyranny of the employer.' But the question is one of policy with which the judiciary has no concern, as Mr. Justice Brandeis would have been the first to concede. Congress, acting within its constitutional powers, has the final say on policy issues. If it acts unwisely, the electorate can make a change. The task of the judiciary ends once it appears that the legislative measure adopted is relevant or appropriate to the constitutional power which Congress exercises. The ingredients of industrial peace and stabilized labor-management relations are numerous and complex. They may well vary from age to age and from industry to industry. What would be needful one decade might be anathema the next. The decision rests with the policy makers, not with the judiciary."

See also *Adair* v. *United States*, 208 U. S. 161, 191–192 (Holmes, J., dissenting):

"I quite agree that the question what and how much good labor unions do, is one on which intelligent people may differ,—I think that laboring men sometimes attribute to them advantages, as many attribute to combinations of capital disadvantages, that really are due to economic conditions of a far wider and deeper kind—but I could not pronounce it unwarranted if Congress should decide that to foster a strong union was for the best interest, not only of the men, but of the railroads and the country at large."

adjustment, those two decisions of this Court appear to require validation of the agency-shop agreement before us.

While recognizing the apparent precedential weight of the *Hanson* and *Street* cases, the appellants advance two reasons why those decisions should not control decision of the present case. First, the appellants note that it is *government employment* that is involved here, thus directly implicating constitutional guarantees, in contrast to the private employment that was the subject of the *Hanson* and *Street* decisions. Second, the appellants say that in the public sector collective bargaining itself is inherently "political," and that to require them to give financial support to it is to require the "ideological conformity" that the Court expressly found absent in the *Hanson* case. 351 U. S., at 238. We find neither argument persuasive.

Because it is employment by the State that is here involved, the appellants suggest that this case is governed by a long line of decisions holding that public employment cannot be conditioned upon the surrender of First Amendment rights.[21] But, while the actions of public employers surely constitute "state action," the union shop, as authorized by the Railway Labor Act, also was found to result from governmental action in *Hanson*.[22] The plaintiffs' claims in *Hanson* failed, not because there was no governmental action, but because there was no First Amendment violation.[23] The

---

[21] See, *e. g.,* cases cited, *infra,* at 233–235.

[22] See *supra,* at 218, and n. 12.

[23] Nothing in our opinion embraces the "premise that public employers are under no greater constitutional constraints than their counterparts in the private sector," *post,* at 245 (POWELL, J., concurring in judgment), or indicates that private collective-bargaining agreements are, without more, subject to constitutional constraints, see *post,* at 252. We compare the agency-shop agreement in this case to those executed under the Railway Labor Act simply because the existence of governmental action in both contexts requires analysis of the free expression question.  .

It is somewhat startling, particularly in view of the concession that

appellants' reliance on the "unconstitutional conditions" doctrine is therefore misplaced.

The appellants' second argument is that in any event collective bargaining in the public sector is inherently "political" and thus requires a different result under the First and Fourteenth Amendments. This contention rests upon the important and often-noted differences in the nature of collective bargaining in the public and private sectors.[24] A public employer, unlike his private counterpart, is not guided by the profit motive and constrained by the normal operation of the market. Municipal services are typically not priced, and

---

*Hanson* was premised on a finding that governmental action was present, see *post,* at 246 (POWELL, J., concurring in judgment), to read in MR. JUSTICE POWELL's concurring opinion that *Hanson* and *Street* "provide little or no guidance for the constitutional issues presented in this case," *post,* at 254. *Hanson* nowhere suggested that the constitutional scrutiny of the agency-shop agreement was watered down because the governmental action operated less directly than is true in a case such as the present one. Indeed, Mr. Justice Douglas, the author of *Hanson,* expressly repudiated that suggestion:

"Since neither Congress nor the state legislatures can abridge [First Amendment] rights, they cannot grant the power to private groups to abridge them. As I read the First Amendment, it forbids any abridgment by government whether directly or indirectly." *Street,* 367 U. S., at 777 (concurring opinion).

[24] See, *e. g.,* K. Hanslowe, The Emerging Law of Labor Relations in Public Employment (1967); H. Wellington & R. Winter, Jr., The Unions and the Cities (1971); Hildebrand, The Public Sector, in J. Dunlop and N. Chamberlain (eds.), Frontiers of Collective Bargaining 125–154 (1967); Rehmus, Constraints on Local Governments in Public Employee Bargaining, 67 Mich. L. Rev. 919 (1969); Shaw & Clark, The Practical Differences Between Public and Private Sector Collective Bargaining, 19 U. C. L. A. L. Rev. 867 (1972); Smith, State and Local Advisory Reports on Public Employment Labor Legislation: A Comparative Analysis, 67 Mich. L. Rev. 891 (1969); Summers, Public Employee Bargaining: A Political Perspective, 83 Yale L. J. 1156 (1974); Project, Collective Bargaining and Politics in Public Employment, 19 U. C. L. A. L. Rev. 887 (1972). The general description in the text of the differences between private- and public-sector collective bargaining is drawn from these sources.

where they are they tend to be regarded as in some sense "essential" and therefore are often price-inelastic. Although a public employer, like a private one, will wish to keep costs down, he lacks an important discipline against agreeing to increases in labor costs that in a market system would require price increases. A public-sector union is correspondingly less concerned that high prices due to costly wage demands will decrease output and hence employment.

The government officials making decisions as the public "employer" are less likely to act as a cohesive unit than are managers in private industry, in part because different levels of public authority—department managers, budgetary officials, and legislative bodies—are involved, and in part because each official may respond to a distinctive political constituency. And the ease of negotiating a final agreement with the union may be severely limited by statutory restrictions, by the need for the approval of a higher executive authority or a legislative body, or by the commitment of budgetary decisions of critical importance to others.

Finally, decisionmaking by a public employer is above all a political process. The officials who represent the public employer are ultimately responsible to the electorate, which for this purpose can be viewed as comprising three overlapping classes of voters—taxpayers, users of particular government services, and government employees. Through exercise of their political influence as part of the electorate, the employees have the opportunity to affect the decisions of government representatives who sit on the other side of the bargaining table. Whether these representatives accede to a union's demands will depend upon a blend of political ingredients, including community sentiment about unionism generally and the involved union in particular, the degree of taxpayer resistance, and the views of voters as to the importance of the service involved and the relation between the demands and the quality of service. It is surely arguable,

however, that permitting public employees to unionize and a union to bargain as their exclusive representative gives the employees more influence in the decisionmaking process than is possessed by employees similarly organized in the private sector.

The distinctive nature of public-sector bargaining has led to widespread discussion about the extent to which the law governing labor relations in the private sector provides an appropriate model. To take but one example, there has been considerable debate about the desirability of prohibiting public employee unions from striking,[25] a step that the State of Michigan itself has taken, Mich. Comp. Laws § 423.202 (1970). But although Michigan has not adopted the federal model of labor relations in every respect, it has determined that labor stability will be served by a system of exclusive representation and the permissive use of an agency shop in public employment. As already stated, there can be no principled basis for according that decision less weight in the constitutional balance than was given in *Hanson* to the congressional judgment reflected in the Railway Labor Act.[26] The only remaining constitutional inquiry evoked by the appellants' argument, therefore, is whether a public employee has a weightier First Amendment interest than a private employee in not being compelled to contribute to the costs of exclusive union representation. We think he does not.

Public employees are not basically different from private employees; on the whole, they have the same sort of skills, the

[25] See, *e. g.*, Anderson, Strikes and Impasse Resolution in Public Employment, 67 Mich. L. Rev. 943 (1969); Burton & Krider, The Role and Consequences of Strikes by Public Employees, 79 Yale L. J. 418 (1970); Hildebrand, *supra*, n. 24; Kheel, Strikes and Public Employment, 67 Mich. L. Rev. 931 (1969); Wellington & Winter, The Limits of Collective Bargaining in Public Employment, 78 Yale L. J. 1107 (1969); Wellington & Winter, More on Strikes by Public Employees, 79 Yale L. J. 441 (1970).

[26] See n. 20, *supra*.

same needs, and seek the same advantages. "The uniqueness of public employment is *not in the employees* nor in the work performed; the uniqueness is in the special character of the employer." Summers, Public Sector Bargaining: Problems of Governmental Decisionmaking, 44 U. Cin. L. Rev. 669, 670 (1975) (emphasis added). The very real differences between exclusive-agent collective bargaining in the public and private sectors are not such as to work any greater infringement upon the First Amendment interests of public employees. A public employee who believes that a union representing him is urging a course that is unwise as a matter of public policy is not barred from expressing his viewpoint. Besides voting in accordance with his convictions, every public employee is largely free to express his views, in public or private, orally or in writing. With some exceptions not pertinent here,[27] public employees are free to participate in the full range of political activities open to other citizens. Indeed, just this Term we have held that the First and Fourteenth Amendments protect the right of a public school teacher to oppose, at a public school board meeting, a position advanced by the teachers' union. *Madison School Dist.* v. *Wisconsin Employment Relations Comm'n,* 429 U. S. 167. In so ruling we recognized that the principle of exclusivity cannot constitutionally be used to muzzle a public employee who, like any other citizen, might wish to express his view about governmental decisions concerning labor relations, *id.,* at 174.

---

[27] Employees of state and local governments may be subject to a "little Hatch Act" designed to ensure that government operates effectively and fairly, that public confidence in government is not undermined, and that government employees do not become a powerful political machine controlled by incumbent officials. See, *e. g., Broadrick* v. *Oklahoma,* 413 U. S. 601, 603–604; *CSC* v. *Letter Carriers,* 413 U. S. 548, 554–567. Moreover, there may be limits on the extent to which an employee in a sensitive or policymaking position may freely criticize his superiors and the policies they espouse. See *Pickering* v. *Board of Education,* 391 U. S. 563, 570 n. 3.

There can be no quarrel with the truism that because public employee unions attempt to influence governmental policy-making, their activities—and the views of members who disagree with them—may be properly termed political. But that characterization does not raise the ideas and beliefs of public employees onto a higher plane than the ideas and beliefs of private employees. It is no doubt true that a central purpose of the First Amendment " 'was to protect the free discussion of governmental affairs.' " *Post,* at 259, quoting *Buckley* v. *Valeo,* 424 U. S. 1, 14, and *Mills* v. *Alabama,* 384 U. S. 214, 218. But our cases have never suggested that expression about philosophical, social, artistic, economic, literary, or ethical matters—to take a nonexhaustive list of labels—is not entitled to full First Amendment protection.[28] Union members in both the public and private sectors may find that a variety of union activities conflict with their beliefs. Compare, *e. g.,*

---

[28] See, *e. g., Wooley* v. *Maynard,* 430 U. S. 705, 714 (the First Amendment "secures the right to proselytize religious, political, *and ideological* causes") (emphasis supplied); *Young* v. *American Mini Theatres,* 427 U. S. 50, 70 (plurality opinion) (protection of the First Amendment is fully applicable to the communication of social, political, or philosophical messages); *id.,* at 87 (dissenting opinion) (even offensive speech that does not address "important topics" is not less worthy of constitutional protection); *Police Dept. of Chicago* v. *Mosley,* 408 U. S. 92, 95–96; *Cohen* v. *California,* 403 U. S. 15, 25, quoting *Winters* v. *New York,* 333 U. S. 507, 528 (Frankfurter, J., dissenting); *Street* v. *New York,* 394 U. S. 576, 593, quoting *West Virginia Bd. of Ed.* v. *Barnette,* 319 U. S. 624, 641–642 (" '[N]o official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, *or other matters of opinion'* ") (emphasis supplied); *NAACP* v. *Button,* 371 U. S. 415, 444–445; *Kingsley Pictures Corp.* v. *Regents,* 360 U. S. 684, 688 (suppression of a motion picture because it expresses the idea that under certain circumstances adultery may be proper behavior strikes at the very heart of First Amendment protection); *NAACP* v. *Alabama ex rel. Patterson,* 357 U. S. 449, 460 ("it is immaterial whether the beliefs sought to be advanced . . . pertain to political, economic, religious, or cultural matters"); *Roth* v. *United States,* 354 U. S. 476, 488, quoting *Thornhill* v. *Alabama,* 310 U. S. 88, 101–102.

*supra,* at 222, with *post,* at 256–257. Nothing in the First Amendment or our cases discussing its meaning makes the question whether the adjective "political" can properly be attached to those beliefs the critical constitutional inquiry.

The differences between public- and private-sector collective bargaining simply do not translate into differences in First Amendment rights. Even those commentators most acutely aware of the distinctive nature of public-sector bargaining and most seriously concerned with its policy implications agree that "[t]he union security issue in the public sector . . . is fundamentally the same issue . . . as in the private sector. . . . No special dimension results from the fact that a union represents public rather than private employees." H. Wellington & R. Winter, Jr., The Unions and the Cities 95–96 (1971). We conclude that the Michigan Court of Appeals was correct in viewing this Court's decisions in *Hanson* and *Street* as controlling in the present case insofar as the service charges are applied to collective-bargaining, contract administration, and grievance-adjustment purposes.

## C

Because the Michigan Court of Appeals ruled that state law "sanctions the use of nonunion members' fees for purposes other than collective bargaining," 60 Mich. App., at 99, 230 N. W. 2d, at 326, and because the complaints allege that such expenditures were made, this case presents constitutional issues not decided in *Hanson* or *Street*. Indeed *Street* embraced an interpretation of the Railway Labor Act not without its difficulties, see 367 U. S., at 784–786 (Black, J., dissenting); *id.,* at 799–803 (Frankfurter, J., dissenting), precisely to avoid facing the constitutional issues presented by the use of union-shop dues for political and ideological purposes unrelated to collective bargaining, *id.,* at 749–750. Since the state court's construction of the Michigan statute

is authoritative, however, we must confront those issues in this case.[29]

Our decisions establish with unmistakable clarity that the freedom of an individual to associate for the purpose of advancing beliefs and ideas is protected by the First and Fourteenth Amendments. *E. g., Elrod* v. *Burns,* 427 U. S. 347, 355–357 (plurality opinion); *Cousins* v. *Wigoda,* 419 U. S. 477, 487; *Kusper* v. *Pontikes,* 414 U. S. 51, 56–57; *NAACP* v. *Alabama ex rel. Patterson,* 357 U. S. 449, 460–461.

---

[29] In *Lathrop* v. *Donohue,* 367 U. S. 820, a companion case to *Street,* a lawyer sued for the refund of dues paid (under protest) to the integrated Wisconsin State Bar. The dues were required as a condition of practicing law in Wisconsin. The plaintiff contended that the requirement violated his constitutionally protected freedom of association because the dues were used by the State Bar to formulate and to support legislative proposals concerning the legal profession to which the plaintiff objected.

A plurality of four Justices found that the requirement was not on its face unconstitutional, relying on the analogy to *Hanson.* And the plurality ruled, as had the Court in *Hanson,* that the constitutional questions tendered were not ripe, for the Court was nowhere "clearly apprised as to the views of the appellant on any particular legislative issues on which the State Bar has taken a position, or as to the way in which and the degree to which funds compulsorily exacted from its members are used to support the organization's political activities." 367 U. S., at 845–846. The other five Members of the Court disagreed with the plurality and thought that the constitutional questions ought to be reached. Three Justices would have upheld the constitutionality of using compulsory dues to finance the State Bar's legislative activities even where opposed by dissenting members. See *id.,* at 848 (Harlan, J., concurring in judgment); *id.,* at 865 (Whittaker, J., concurring in result). The other two Justices would have held such activities to be unconstitutional. See *ibid.* (Black, J., dissenting); *id.,* at 877 (Douglas, J., dissenting).

The only proposition about which a majority of the Court in *Lathrop* agreed was that the constitutional issues should be reached. However, due to the disparate views of those five Justices on the merits and the failure of the other four Members of the Court to discuss the constitutional questions, *Lathrop* does not provide a clear holding to guide us in adjudicating the constitutional questions here presented.

Equally clear is the proposition that a government may not require an individual to relinquish rights guaranteed him by the First Amendment as a condition of public employment. *E. g., Elrod* v. *Burns, supra,* at 357–360, and cases cited; *Perry* v. *Sindermann,* 408 U. S. 593; *Keyishian* v. *Board of Regents,* 385 U. S. 589. The appellants argue that they fall within the protection of these cases because they have been prohibited, not from actively associating, but rather from refusing to associate. They specifically argue that they may constitutionally prevent the Union's spending a part of their required service fees to contribute to political candidates and to express political views unrelated to its duties as exclusive bargaining representative. We have concluded that this argument is a meritorious one.

One of the principles underlying the Court's decision in *Buckley* v. *Valeo,* 424 U. S. 1, was that contributing to an organization for the purpose of spreading a political message is protected by the First Amendment. Because "[m]aking a contribution . . . enables like-minded persons to pool their resources in furtherance of common political goals," *id.,* at 22, the Court reasoned that limitations upon the freedom to contribute "implicate fundamental First Amendment interests," *id.,* at 23.[30]

The fact that the appellants are compelled to make, rather than prohibited from making, contributions for political purposes works no less an infringement of their constitutional rights.[31] For at the heart of the First Amendment is the

---

[30] See also *Shelton* v. *Tucker,* 364 U. S. 479 (state statute which required every teacher to file annually an affidavit listing every organization to which he had belonged *or regularly contributed* is unconstitutional because of its unlimited and indiscriminate interference with freedom of association).

[31] This view has long been held. James Madison, the First Amendment's author, wrote in defense of religious liberty: "Who does not see . . . [t]hat the same authority which can force a citizen to contribute three pence only of his property for the support of any one establishment, may

notion that an individual should be free to believe as he will, and that in a free society one's beliefs should be shaped by his mind and his conscience rather than coerced by the State. See *Elrod* v. *Burns, supra,* at 356–357; *Stanley* v. *Georgia,* 394 U. S. 557, 565; *Cantwell* v. *Connecticut,* 310 U. S. 296, 303–304. And the freedom of belief is no incidental or secondary aspect of the First Amendment's protections:

> "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *West Virginia Bd. of Ed.* v. *Barnette,* 319 U. S. 624, 642.

These principles prohibit a State from compelling any individual to affirm his belief in God, *Torcaso* v. *Watkins,* 367 U. S. 488, or to associate with a political party, *Elrod* v. *Burns, supra;* see 427 U. S., at 363–364, n. 17, as a condition of retaining public employment. They are no less applicable to the case at bar, and they thus prohibit the appellees from requiring any of the appellants to contribute to the support of an ideological cause he may oppose as a condition of holding a job as a public school teacher.

We do not hold that a union cannot constitutionally spend funds for the expression of political views, on behalf of political candidates, or toward the advancement of other ideological causes not germane to its duties as collective-bargaining representative.[32] Rather, the Constitution requires only that

---

force him to conform to any other establishment in all cases whatsoever?" 2 The Writings of James Madison 186 (Hunt ed. 1901). Thomas Jefferson agreed that " 'to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves, is sinful and tyrannical.' " I. Brant, James Madison: The Nationalist 354 (1948).

[32] To the extent that this activity involves support of political candidates, it must, of course, be conducted consistently with any applicable (and constitutional) system of election campaign regulation. See gen-

such expenditures be financed from charges, dues, or assessments paid by employees who do not object to advancing those ideas and who are not coerced into doing so against their will by the threat of loss of governmental employment.

There will, of course, be difficult problems in drawing lines between collective-bargaining activities, for which contributions may be compelled, and ideological activities unrelated to collective bargaining, for which such compulsion is prohibited.[33] The Court held in *Street,* as a matter of statutory construction, that a similar line must be drawn under the Railway Labor Act, but in the public sector the line may be somewhat hazier. The process of establishing a written collective-bargaining agreement prescribing the terms and conditions of public employment may require not merely concord at the bargaining table, but subsequent approval by other public authorities; related budgetary and appropriations decisions might be seen as an integral part of the bargaining process. We have no occasion in this case, however, to try to define such a dividing line. The case comes to us after a judgment on the pleadings, and there is no evidentiary record of any kind. The allegations in the complaints are general ones, see *supra,* at 212–213, and the parties have neither briefed nor argued the question of what specific Union activities in the present context properly fall under the definition of collective bargaining. The lack of factual concreteness and adversary presentation to aid us in approaching the difficult line-drawing questions highlights the

---

erally *Buckley* v. *Valeo,* 424 U. S. 1; Developments in the Law—Elections, 88 Harv. L. Rev. 1111, 1237–1271 (1975).

[33] The appellants' complaints also alleged that the Union carries on various "social activities" which are not open to nonmembers. It is unclear to what extent such activities fall outside the Union's duties as exclusive representative or involve constitutionally protected rights of association. Without greater specificity in the description of such activities and the benefit of adversary argument, we leave those questions in the first instance to the Michigan courts.

importance of avoiding unnecessary decision of constitutional questions.[34] All that we decide is that the general allegations in the complaints, if proved, establish a cause of action under the First and Fourteenth Amendments.

## III

In determining what remedy will be appropriate if the appellants prove their allegations, the objective must be to devise a way of preventing compulsory subsidization of ideological activity by employees who object thereto without restricting the Union's ability to require every employee to contribute to the cost of collective-bargaining activities.[35] This task is simplified by the guidance to be had from prior decisions. In *Street,* the plaintiffs had proved at trial that expenditures were being made for political purposes of various kinds, and

---

[34] A further reason to avoid anticipating difficult constitutional questions in this case is the possibility that the dispute may be settled by resort to a newly adopted internal Union remedy. See *infra,* at 240, and n. 41.

[35] It is plainly not an adequate remedy to limit the use of the actual dollars collected from dissenting employees to collective-bargaining purposes:

"[Such a limitation] is of bookkeeping significance only rather than a matter of real substance. It must be remembered that the service fee is admittedly the exact equal of membership initiation fees and monthly dues . . . and that . . . dues collected from members may be used for a 'variety of purposes, in addition to meeting the union's costs of collective bargaining.' Unions 'rather typically' use their membership dues 'to do those things which the members authorize the union to do in their interest and on their behalf.' If the union's total budget is divided between collective bargaining and institutional expenses and if nonmember payments, equal to those of a member, go entirely for collective bargaining costs, the nonmember will pay more of these expenses than his pro rata share. The member will pay less and to that extent a portion of his fees and dues is available to pay institutional expenses. The union's budget is balanced. By paying a larger share of collective bargaining costs the nonmember subsidizes the union's institutional activities." *Retail Clerks* v. *Schermerhorn,* 373 U. S. 746, 753–754.

the Court found those expenditures illegal under the Railway Labor Act. See *supra,* at 219–220. Moreover, in that case each plaintiff had "made known to the union representing his craft or class his dissent from the use of his money for political causes which he opposes." 367 U. S., at 750; see *id.,* at 771. The Court found that "[i]n that circumstance, the respective unions were without power to use payments thereafter tendered by them for such political causes." *Ibid.* Since, however, *Hanson* had established that the union-shop agreement was not unlawful as such, the Court held that to enjoin its enforcement would "[sweep] too broadly." 367 U. S., at 771. The Court also found that an injunction prohibiting the union from expending dues for political purposes would be inappropriate, not only because of the basic policy reflected in the Norris-La Guardia Act[36] against enjoining labor unions, but also because those union members who do wish part of their dues to be used for political purposes have a right to associate to that end "without being silenced by the dissenters." *Id.,* at 772–773.[37]

After noting that "dissent is not to be presumed" and that only employees who have affirmatively made known to the union their opposition to political uses of their funds are entitled to relief, the Court sketched two possible remedies: First, "an injunction against expenditure for political causes opposed by each complaining employee of a sum, from those moneys to be spent by the union for political purposes, which is so much of the moneys exacted from him as is the proportion of the union's total expenditures made for such political activities to the union's total budget"; and second, restitution of a fraction of union dues paid equal to the fraction of total union expenditures that were made for political purposes opposed by the employee. *Id.,* at 774–775.[38]

---

[36] 29 U. S. C. §§ 101–115.

[37] See *supra,* at 234, and n. 30.

[38] In proposing a restitution remedy, the *Street* opinion made clear

The Court again considered the remedial question in *Railway Clerks* v. *Allen*, 373 U. S. 113. In that case employees who had refused to pay union-shop dues obtained injunctive relief in state court against enforcement of the union-shop agreement. The employees had not notified the union prior to bringing the lawsuit of their opposition to political expenditures, and at trial, their testimony was principally that they opposed such expenditures, as a general matter. *Id.,* at 118–119, n. 5. The Court held that the employees had adequately established their cause of action by manifesting "opposition to *any* political expenditures by the union," *id.,* at 118 (emphasis in original), and that the requirement in *Street* that dissent be affirmatively indicated was satisfied by the allegations in the complaint that was filed, 373 U. S., at 118–119, and n. 6.[39] The Court indicated again the appropriateness of the two remedies sketched in *Street;* reversed the judgment affirming issuance of the injunction; and remanded for determination of which expenditures were properly to be characterized as political and what percentage of total union expenditures they constituted.[40]

that "[t]here should be no necessity, however, for the employee to trace his money up to and including its expenditure; if the money goes into general funds and no separate accounts of receipts and expenditures of the funds of individual employees are maintained, the portion of his money the employee would be entitled to recover would be in the same proportion that the expenditures for political purposes which he had advised the union he disapproved bore to the total union budget." 367 U. S., at 775.

[39] *Allen* can be viewed as a relaxation of the conditions established in *Street* governing eligibility for relief. See *Allen,* 373 U. S., at 129–131 (Harlan, J., concurring in part and dissenting in part). *Street* seemed to imply that an employee would be required to identify the *particular* causes which he opposed. 367 U. S., at 774–775. Any such implication was clearly disapproved in *Allen,* and, as explained today, see *infra,* at 241, there are strong reasons for preferring the approach of *Allen.*

[40] The Court in *Allen* went on to elaborate:

"Since the unions possess the facts and records from which the proportion of political to total union expenditures can reasonably be calcu-

The Court in *Allen* described a "practical decree" that could properly be entered, providing for (1) the refund of a portion of the exacted funds in the proportion that union political expenditures bear to total union expenditures, and (2) the reduction of future exactions by the same proportion. 373 U. S., at 122. Recognizing the difficulties posed by judicial administration of such a remedy, the Court also suggested that it would be highly desirable for unions to adopt a "voluntary plan by which dissenters would be afforded an internal union remedy." *Ibid.* This last suggestion is particularly relevant to the case at bar, for the Union has adopted such a plan since the commencement of this litigation.[41]

Although *Street* and *Allen* were concerned with statutory rather than constitutional violations, that difference surely could not justify any lesser relief in this case. Judged by the standards of those cases, the Michigan Court of Appeals' ruling that the appellants were entitled to no relief at this juncture was unduly restrictive. For all the reasons

lated, basic considerations of fairness compel that they, not the individual employees, bear the burden of proving such proportion. Absolute precision in the calculation of such proportion is not, of course, to be expected or required; we are mindful of the difficult accounting problems that may arise. And no decree would be proper which appeared likely to infringe the unions' right to expend uniform exactions under the union-shop agreement in support of activities germane to collective bargaining and, as well, to expend nondissenters' such exactions in support of political activities." 373 U. S., at 122.

[41] Under the procedure adopted by the Union, as explained in the appellees' brief, a dissenting employee may protest at the beginning of each school year the expenditure of any part of his agency-shop fee for " 'activities or causes of a political nature or involving controversial issues of public importance only incidentally related to wages, hours, and conditions of employment.' " The employee is then entitled to a pro rata refund of his service charge in accordance with the calculation of the portion of total Union expenses for the specified purposes. The calculation is made in the first instance by the Union, but is subject to review by an impartial board.

outlined in *Street,* the court was correct in denying the broad injunctive relief requested. But in holding that as a prerequisite to any relief each appellant must indicate to the Union the *specific* expenditures to which he objects, the Court of Appeals ignored the clear holding of *Allen.* As in *Allen,* the employees here indicated in their pleadings that they opposed ideological expenditures of *any* sort that are unrelated to collective bargaining. To require greater specificity would confront an individual employee with the dilemma of relinquishing either his right to withhold his support of ideological causes to which he objects or his freedom to maintain his own beliefs without public disclosure.[42] It would also place on each employee the considerable burden of monitoring all of the numerous and shifting expenditures made by the Union that are unrelated to its duties as exclusive bargaining representative.

The Court of Appeals thus erred in holding that the plaintiffs are entitled to no relief if they can prove the

---

[42] In *Buckley* v. *Valeo,* the Court recognized that compelled disclosure of political campaign contributions and expenditures "can seriously infringe on privacy of association and belief guaranteed by the First Amendment." 424 U. S., at 64. See, *e. g., Gibson* v. *Florida Legislative Comm.,* 372 U. S. 539; *Bates* v. *Little Rock,* 361 U. S. 516; *NAACP* v. *Alabama ex rel. Patterson,* 357 U. S. 449. The Court noted that "the invasion of privacy of belief may be as great when the information sought concerns the giving and spending of money as when it concerns the joining of organizations," and that therefore our past decisions have extended constitutional protection to contributors and members interchangeably. 424 U. S., at 66, citing *California Bankers Assn.* v. *Shultz,* 416 U. S. 21, 78–79 (POWELL, J., concurring); *Bates* v. *Little Rock, supra,* at 518; and *United States* v. *Rumely,* 345 U. S. 41.

Disclosure of the specific causes to which an individual employee is opposed (which necessarily discloses, by negative implication, those causes the employee does support) may subject him to "economic reprisal, . . . threat of physical coercion, and other manifestations of public hostility," and might dissuade him from exercising the right to withhold support "because of fear of exposure of [his] beliefs . . . and of the consequences of this exposure." *NAACP* v. *Alabama ex rel. Patterson, supra,* at 462–463.

allegations contained in their complaints,[43] and in depriving them of an opportunity to establish their right to appropriate relief, such, for example, as the kind of remedies described in *Street* and *Allen.*[44] In view of the newly adopted Union internal remedy, it may be appropriate under Michigan law, even if not strictly required by any doctrine of exhaustion of remedies, to defer further judicial proceedings pending the voluntary utilization by the parties of that internal remedy as a possible means of settling the dispute.[45]

The judgment is vacated, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

Mr. Justice Rehnquist, concurring.

Had I joined the plurality opinion in *Elrod* v. *Burns,* 427 U. S. 347 (1976), I would find it virtually impossible to join the Court's opinion in this case. In *Elrod,* the plurality stated:

"The illuminating source to which we turn in performing the task [of constitutional adjudication] is the system

---

[43] Although the appellants did not specifically pray for either of the remedies described in *Street* and *Allen,* the complaints in both *Abood* and *Warczak* included a general prayer for "such further and other relief as may be necessary, or may to the Court seem just and equitable."

The *Warczak* complaint was styled as a class action, but the trial court dismissed the complaint without addressing the propriety of class relief under Michigan law. We therefore have no occasion to address the question whether an individual employee who is not a named plaintiff but merely a member of the plaintiff class is, without more, entitled to relief under *Street* and *Allen* as a matter of federal law.

[44] See *supra,* at 237–240, and nn. 38, 40.

[45] We express no view as to the constitutional sufficiency of the internal remedy described by the appellees. If the appellants initially resort to that remedy and ultimately conclude that it is constitutionally deficient in some respect, they would of course be entitled to judicial consideration of the adequacy of the remedy.

of government the First Amendment was intended to protect, a democratic system whose proper functioning is indispensably dependent on the unfettered judgment of each citizen on matters of political concern. Our decision in obedience to the guidance of that source does not outlaw political parties or political campaigning and management. Parties are free to exist and their concomitant activities are free to continue. We require only that the rights of every citizen to believe as he will and to act and associate according to his beliefs be free to continue as well." *Id.*, at 372.

I do not read the Court's opinion as leaving intact the "unfettered judgment of each citizen on matters of political concern" when it holds that Michigan may, consistently with the First and Fourteenth Amendments, require an objecting member of a public employees' union to contribute to the funds necessary for the union to carry out its bargaining activities. Nor does the Court's opinion leave such a member free "to believe as he will and to act and associate according to his beliefs." I agree with the Court, and with the views expressed in MR. JUSTICE POWELL's opinion concurring in the judgment, that the positions taken by public employees' unions in connection with their collective-bargaining activities inevitably touch upon political concern if the word "political" be taken in its normal meaning. Success in pursuit of a particular collective-bargaining goal will cause a public program or a public agency to be administered in one way; failure will result in its being administered in another way.

I continue to believe, however, that the dissenting opinion of MR. JUSTICE POWELL in *Elrod* v. *Burns, supra,* which I joined, correctly stated the governing principles of First and Fourteenth Amendment law in the case of public employees such as this. I am unable to see a constitutional distinction between a governmentally imposed requirement that a public employee be a Democrat or Republican or else lose his job,

and a similar requirement that a public employee contribute to the collective-bargaining expenses of a labor union. I therefore join the opinion and judgment of the Court.

MR. JUSTICE STEVENS, concurring.

By joining the opinion of the Court, including its discussion of possible remedies, I do not imply—nor do I understand the Court to imply—that the remedies described in *Machinists* v. *Street,* 367 U. S. 740, and *Railway Clerks* v. *Allen,* 373 U. S. 113, would necessarily be adequate in this case or in any other case. More specifically, the Court's opinion does not foreclose the argument that the Union should not be permitted to exact a service fee from nonmembers without first establishing a procedure which will avoid the risk that their funds will be used, even temporarily, to finance ideological activities unrelated to collective bargaining. Any final decision on the appropriate remedy must await the full development of the facts at trial.*

MR. JUSTICE POWELL, with whom THE CHIEF JUSTICE and MR. JUSTICE BLACKMUN join, concurring in the judgment.

The Court today holds that a State cannot constitutionally compel public employees to contribute to union political activities which they oppose. On this basis the Court concludes that "the general allegations in the complaints, if proved, establish a cause of action under the First and Fourteenth Amendments." *Ante,* at 237. With this much of the Court's opinion I agree, and I therefore join the Court's judgment remanding this case for further proceedings.

---

*The case is before us on the equivalent of a motion to dismiss. *Ante,* at 213–214, n. 4. Our knowledge of the facts is limited to a bald assertion that the Union engages " 'in a number and variety of activities and programs which are economic, political, professional, scientific and religious in nature of which Plaintiffs do not approve . . . .' " *Ante,* at 213, and n. 3. What, if anything, will be proved at trial is a matter for conjecture.

But the Court's holding and judgment are but a small part of today's decision. Working from the novel premise that public employers are under no greater constitutional constraints than their counterparts in the private sector, the Court apparently rules that public employees can be compelled by the State to pay full union dues to a union with which they disagree, subject only to a possible rebate or deduction if they are willing to step forward, declare their opposition to the union, and initiate a proceeding to establish that some portion of their dues has been spent on "ideological activities unrelated to collective bargaining." *Ante,* at 236. Such a sweeping limitation of First Amendment rights by the Court is not only unnecessary on this record; it is in my view unsupported by either precedent or reason.

I

The Court apparently endorses the principle that the State infringes interests protected by the First Amendment when it compels an individual to support the political activities of others as a condition of employment. See *ante,* at 222–223, 233–235. One would think that acceptance of this principle would require a careful inquiry into the constitutional interests at stake in a case of this importance. But the Court avoids such an inquiry on the ground that it is foreclosed by this Court's decisions in *Railway Employes' Dept.* v. *Hanson,* 351 U. S. 225 (1956), and *Machinists* v. *Street,* 367 U. S. 740 (1961). With all respect, the Court's reliance on these cases, which concerned only congressional authorization of union-shop agreements in the private sector, is misplaced.

A

The issue before the Court in *Hanson* was the constitutionality of the Railway Labor Act's authorization of union-shop agreements in the private sector. Section 2 Eleventh of that Act, 45 U. S. C. § 152 Eleventh, provides in essence that, notwithstanding any contrary provision of state law, employers

and unions are permitted to enter into voluntary agreements whereby employment is conditioned on payment of full union dues and fees. See *ante,* at 218 n. 11. The suit was brought by nonunion members who claimed that Congress had forced them into "ideological and political associations which violate their right to freedom of conscience, freedom of association, and freedom of thought protected by the Bill of Rights." 351 U. S., at 236.

Acceptance of this claim would have required adoption by the Court of a series of far-reaching propositions: (i) that there was sufficient governmental involvement in the private union-shop agreement to justify inquiry under the First Amendment; (ii) that a refusal to pay money to a union could be "speech" protected by the First Amendment; (iii) that Congress had interfered with or infringed that protected speech interest by authorizing union shops; and (iv) that the interference was unwarranted by any overriding congressional objective. The Court adopted only the first of these propositions: It agreed with the Supreme Court of Nebraska that § 2 Eleventh, by authorizing union-shop agreements that otherwise might be forbidden by state law, had involved Congress sufficiently to justify examination of the First Amendment claims.

On the merits the Court concluded that there was no violation of the First Amendment. The reasoning behind this conclusion was not elaborate. Some language in the opinion appears to suggest that even if Congress had compelled employers and employees to enter into union-shop agreements, the required financial support for the union would not infringe any protected First Amendment interest.[1] But the Court

---

[1] The Court compared the union shop to the organized bar: "On the present record, there is no more an infringement or impairment of First Amendment rights than there would be in the case of a lawyer who by state law is required to be a member of an integrated bar." 351 U. S., at 238. Mr. Justice Douglas, author of the Court's opinion in *Hanson,*

did not lose sight of the distinction between governmentally compelled financial support and the actual effect of the Railway Labor Act: "The union shop provision of the Railway Labor Act is only permissive. Congress has not compelled nor required carriers and employees to enter into union shop agreements." (Footnote omitted.) 351 U. S., at 231. As the Court later reflected in *Street:*

"[A]ll that was held in *Hanson* was that § 2, Eleventh was constitutional in its bare authorization of union-shop contracts requiring workers to give 'financial support' to unions legally authorized to act as their collective bargaining agents. . . ." 367 U. S., at 749.

To the extent that *Hanson* suggests that withholding financial support from unions is unprotected by the First Amendment against governmental compulsion, it is significantly undercut by the subsequent decision in *Street*. The claim before the Court in *Street* was similar to that in *Hanson:* minority employees complained that they were being forced by a union-shop agreement to pay full union dues. This time, however, the employees specifically complained that part of their dues was being used for political activities to which they were opposed. And this time the Court perceived that the constitutional questions were "of the utmost gravity." 367 U. S., at 749. In order to avoid having to decide those difficult questions, the Court read into the Act a restriction on a union's use of an employee's money for political activities: "[W]e hold . . . that § 2, Eleventh is to be construed to deny the unions, over an employee's objection, the power to use his exacted funds to support political causes which he opposes." *Id.,* at 768–769.

In so reading § 2 Eleventh to avoid "unnecessary constitutional decisions," 367 U. S., at 749, *Street* suggests a rethinking

---

later remarked that "on reflection the analogy fails." *Lathrop* v. *Donohue,* 367 U. S. 820, 879 (1961) (dissenting opinion).

of the First Amendment issues decided so summarily—indeed, almost viewed as inconsequential—in *Hanson*. To be sure, precisely because the decision in *Street* does not rest explicitly on the Constitution, the opinion for the Court supplies no more reasoned analysis of the constitutional issues than did the opinion in *Hanson*. But examination of the Court's strained construction of the Railway Labor Act in light of the various separate opinions in *Street* suggests that the Court sought to leave open three important constitutional questions by taking the course that it did.

First, the Court's reading of the Act made it unnecessary to decide whether the withholding of financial support from a union's political activities is a type of "speech" protected against governmental abridgment by the First Amendment. Mr. Justice Douglas, who wrote the opinion for the Court in *Hanson* and provided the necessary fifth vote in *Street*, believed that "use of union funds for political purposes subordinates the individual's First Amendment rights to the views of the majority." 367 U. S., at 778. Mr. Justice Black expressed a similar view in dissent. *Id.*, at 790–791. But Mr. Justice Frankfurter, joined by Mr. Justice Harlan, strongly disagreed, *id.*, at 806, and the Court's reading of the statute made it unnecessary to resolve the dispute.

Second, the Court's approach made it possible to reserve judgment on whether, assuming protected First Amendment interests were implicated, Congress might go further in approving private arrangements that would interfere with those interests than it could in commanding such arrangements. Mr. Justice Douglas had no doubts that the constraints on Congress were the same in either case:

> "Since neither Congress nor the state legislatures can abridge [First Amendment] rights, they cannot grant the power to private groups to abridge them. As I read the First Amendment, it forbids any abridgment by government whether directly or indirectly." *Id.*, at 777.

But here, too, Mr. Justice Frankfurter disagreed:

> "[W]e must consider the difference between . . . compulsion and the absence of compulsion when Congress acts as platonically as it did, in a wholly non-coercive way. Congress has not commanded that the railroads shall employ only those workers who are members of authorized unions. . . . When we speak of the Government 'acting' in permitting the union shop, the scope and force of what Congress has done must be heeded. There is not a trace of compulsion involved—no exercise of restriction by Congress on the freedom of the carriers and the unions. . . ." *Id.*, at 806–807.

And here, too, the Court's reading of the statute permitted it to avoid an unnecessary constitutional decision.[2]

Finally, by placing its decision on statutory grounds, the Court was able to leave open the question whether, assuming the Act intruded on protected First Amendment interests, the intrusion could be justified by the governmental interests asserted on its behalf. *Hanson* made it unnecessary to address this issue with respect to funds exacted solely for collective bargaining.[3] And by reading the Railway Labor Act to pro-

---

[2] The Court today simply reads the separate opinion of Mr. Justice Douglas in *Street* as expressing the holding of the Court in *Hanson*. *Ante*, at 227 n. 23; see *ante*, at 222–223. While it may be possible to read *Hanson* this way, see n. 1, *supra*, it is certainly unnecessary to do so in light of the issues actually presented and resolved in that case. The Court offers no explanation of why Justices Frankfurter and Harlan, who believed that "the scope and force of what Congress has done must be heeded," 367 U. S., at 807, would acquiesce in the finding of governmental action in *Hanson* if that finding represented a definitive ruling that governmental authorization of a private union-shop agreement subjects the agreement itself to the full constraints of the First Amendment.

[3] Whether because no First Amendment interests were implicated, or because Congress had done nothing affirmatively to infringe such interests, or because any infringement of First Amendment interests was necessary to serve overriding governmental purposes, the Court was unanimous that the

hibit a union's use of exacted funds for political purposes, *Street* made it unnecessary to discuss whether authorizing such a use of union-shop funds might ever be justified.[4]

In my view, these cases can and should be read narrowly. The only constitutional principle for which they clearly stand is the narrow holding of *Hanson* that the Railway Labor Act's authorization of voluntary union-shop agreements in the private sector does not violate the First Amendment. They do not hold that the withholding of financial support from a union is protected speech; nor do they signify that the government could constitutionally compel employees, absent a private union-shop agreement, to pay full union dues to a union representative as a condition of employment; nor do they say anything about the kinds of governmental interests that could justify such compulsion, if indeed justification were required by the First Amendment.

## B

The Court's extensive reliance on *Hanson* and *Street* requires it to rule that there is no constitutional distinction between what the government can require of its own employees and what it can permit private employers to do. To me the distinction is fundamental. Under the First Amendment the government may authorize private parties to enter into voluntary agreements whose terms it could not adopt as its own.

We stressed the importance of this distinction only recently,

---

Railway Labor Act was constitutional insofar as it protected private agreements that would compel payment of sufficient fees to cover collective-bargaining costs. 367 U. S., at 771; 778 (Douglas, J., concurring); 779 (opinion of Whittaker, J.); 791 (Black, J., dissenting); 804 (Frankfurter, J., dissenting).

[4] The Court explicitly reserved judgment on "the matter of expenditures for activities in the area between the costs which led directly to the complaint as to 'free riders,' and the expenditures to support union political activities." *Id.*, at 769–770.

in *Jackson* v. *Metropolitan Edison Co.,* 419 U. S. 345 (1974). There a New York resident had brought suit against a private utility, claiming that she had been denied due process when the utility terminated her service without notice or a hearing and alleging that the utility's summary termination procedures had been "specifically authorized and approved" by the State. In sustaining dismissal of the complaint, we held that authorization and approval did not transform the procedures of the company into the procedures of the State:

> "The nature of governmental regulation of private utilities is such that a utility may frequently be required by the state regulatory scheme to obtain approval for practices a business regulated in less detail would be free to institute without any approval from a regulatory body. Approval by a state utility commission of such a request from a regulated utility, where the commission has not put its own weight on the side of the proposed practice by ordering it, does not transmute a practice initiated by the utility and approved by the commission into 'state action.'" *Id.,* at 357.

Had the State itself adopted the procedures it approved for the utility, it would have been subject to the full constraints of the Constitution.[5]

---

[5] This is not to say, of course, that governmental authorization of private action is free from constitutional scrutiny under the Bill of Rights and the Fourteenth Amendment. The historical context of a facially permissive enactment may demonstrate that its purpose and effect are to bring about a result that the Constitution forbids the legislature to achieve by direct command. It is well established, for example, that a State cannot promote racial discrimination by laws designed to foster and encourage discriminatory practices in the private sector. See *Reitman* v. *Mulkey,* 387 U. S. 369 (1967); cf. *Moose Lodge No. 107* v. *Irvis,* 407 U. S. 163, 176–177 (1972). And the Court in *Street* would not have read the Railway Labor Act as restrictively as it did, had it not been concerned that a broader reading might result in the indirect curtailment of First Amendment rights by Congress. But I am not aware that the Court has ever before held, as it

An analogy is often drawn between the collective-bargaining agreement in labor relations and a legislative code. This Court has said, for example, that the powers of a union under the Railway Labor Act are "comparable to those possessed by a legislative body both to create and restrict the rights of those whom it represents . . . ." *Steele* v. *Louisville & N. R. Co.*, 323 U. S. 192, 202 (1944). Some have argued that this analogy requires each provision of a private collective-bargaining agreement to meet the same limitations that the Constitution imposes on congressional enactments.[6] But this Court has wisely refrained from adopting this view and generally has measured the rights and duties embodied in a collective-bargaining agreement only against the limitations imposed by Congress. See *Emporium Capwell Co.* v. *Western Addition Community Org.*, 420 U. S. 50, 62–65 (1975); *NLRB* v. *Allis-Chalmers Mfg. Co.*, 388 U. S. 175, 180–181 (1967).[7]

Similar constitutional restraint would be wholly inappropriate in the public sector. The collective-bargaining agreement to which a public agency is a party is not merely analogous to legislation, it has all of the attributes of legisla-

apparently has today, that the same constitutional constraints invariably apply when the government fosters or encourages a result in the private sector by permissive legislation as when it commands that result by the full force of law.

[6] See Note, Individual Rights in Industrial Self-Government—A "State Action" Analysis, 63 Nw. U. L. Rev. 4 (1968); cf. Blumrosen, Group Interests in Labor Law, 13 Rutgers L. Rev. 432, 482–483 (1959).

[7] If collective-bargaining agreements were subjected to the same constitutional constraints as federal rules and regulations, it would be difficult to find any stopping place in the constitutionalization of regulated private conduct. "Most private activity is infused with the governmental in much the way that the union shop is. . . . Enacted and decisional law everywhere conditions and shapes the nature of private arrangements in our society. This is true with the commercial contract—regulated as it is by comprehensive uniform statutes—no less than with the collective bargaining agreement . . . ." H. Wellington, Labor and the Legal Process 244–245 (1968).

tion for the subjects with which it deals. Where a teachers' union, for example, acting pursuant to a state statute authorizing collective bargaining in the public sector, obtains the agreement of the school board that teachers residing outside the school district will not be hired, the provision in the bargaining agreement to that effect has the same force as if the school board had adopted it by promulgating a regulation. Indeed, the rule in Michigan is that where a municipal collective-bargaining agreement conflicts with an otherwise valid municipal ordinance, the ordinance must yield to the agreement. *Detroit Police Officers Assn.* v. *Detroit,* 391 Mich. 44, 214 N. W. 2d 803 (1974) (holding that a duly enacted residency requirement for police must yield to any contrary agreement reached by collective bargaining).

The State in this case has not merely authorized agency-shop agreements between willing parties; it has negotiated and adopted such an agreement itself. Acting through the Detroit Board of Education, the State has undertaken to compel employees to pay full fees equal in amount to dues to a union as a condition of employment. Accordingly, the Board's collective-bargaining agreement, like any other enactment of state law, is fully subject to the constraints that the Constitution imposes on coercive governmental regulation.[8]

---

[8] Cf. Summers, Public Sector Bargaining: Problems of Governmental Decisionmaking, 44 U. Cin. L. Rev. 669, 670 (1975):

"The uniqueness of public employment is not in the employees nor in the work performed; the uniqueness is in the special character of the employer. The employer is government; the ones who act on behalf of the employer are public officials; and the ones to whom those officials are answerable are citizens and voters. We have developed a whole structure of constitutional and statutory principles, and a whole culture of political practices and attitudes as to how government is to be conducted, what powers public officials are to exercise, and how they are to be made answerable for their actions. Collective bargaining by public employers must fit within the governmental structure and must function consistently with our governmental processes; the problems of the public employer

Because neither *Hanson* nor *Street* confronted the kind of governmental participation in the agency shop that is involved here, those cases provide little or no guidance for the constitutional issues presented in this case.[9] With the understanding, therefore, that the Court writes on a clean constitutional slate in the field of public-sector collective bargaining, I turn to the merits.

## II

The Court today holds that compelling an employee to finance a union's "ideological activities unrelated to collective bargaining" violates the First Amendment, regardless of any asserted governmental justification. *Ante,* at 236. But the Court also decides that compelling an employee to finance any union activity that may be "related" in some way to collective bargaining is permissible under the First Amendment because such compulsion is "relevant or appropriate" to asserted governmental interests. *Ante,* at 222–223, 225 n. 20. And the Court places the burden of litigation on the individual. In order to vindicate his First Amendment rights in a union

---

accommodating its collective bargaining function to government structures and processes is what makes public sector bargaining unique."

[9] The Court's reliance on *Hanson* and *Street* is ambivalent, to say the least. *Street* construed § 2 Eleventh of the Railway Labor Act "to deny the unions, over an employee's objection, the power to use his exacted funds to support political causes which he opposes." 367 U. S., at 768–769. The opinion distinguishes not only between those union activities which are related to collective bargaining and those which are not, but "between the use of union funds for political purposes and their expenditure for nonpolitical purposes." *Id.,* at 769 n. 17. Yet the Court today repudiates the latter distinction, holding that nothing turns on whether union activity may be characterized as political. *Ante,* at 231–232. If it is true, as the Court believes, that *Hanson* and *Street* declare the limits of constitutional protection from a governmental union shop, *ante,* at 222–223, the Court's abandonment of the political-nonpolitical distinction drawn by those cases can only be explained by a desire to avoid its full implications in the public sector, where the subjects of bargaining are inherently political. See *infra,* at 256–258.

shop, the individual employee apparently must declare his opposition to the union and initiate a proceeding to determine what part of the union's budget has been allocated to activities that are both "ideological" and "unrelated to collective bargaining." *Ante,* at 237–241.

I can agree neither with the Court's rigid two-tiered analysis under the First Amendment, nor with the burden it places on the individual. Under First Amendment principles that have become settled since *Hanson* and *Street* were decided, it is now clear, first, that *any* withholding of financial support for a public-sector union is within the protection of the First Amendment; and, second, that the State should bear the burden of proving that any union dues or fees that it requires of nonunion employees are needed to serve paramount governmental interests.

### A

The initial question is whether a requirement of a school board that all of its employees contribute to a teachers' union as a condition of employment impinges upon the First Amendment interests of those who refuse to support the union, whether because they disapprove of unionization of public employees or because they object to certain union activities or positions. The Court answers this question in the affirmative: "The fact that [government employees] are compelled to make . . . contributions for political purposes works . . . an infringement of their constitutional rights," *ante,* at 234, and *any* compelled support for a union "has an impact upon" and may be thought to "interfere in some way with" First Amendment interests. *Ante,* at 222. I agree with the Court as far as it goes, but I would make it more explicit that compelling a government employee to give financial support to a union in the public sector—regardless of the uses to which the union puts the contribution—impinges seriously upon interests in free speech and association protected by the First Amendment.

In *Buckley* v. *Valeo,* 424 U. S. 1 (1976), we considered the

constitutional validity of the Federal Election Campaign Act of 1971, as amended in 1974, which in one of its provisions limited the amounts that individuals could contribute to federal election campaigns. We held that these limitations on political contributions "impinge on protected associational freedoms":

> "Making a contribution, like joining a political party, serves to affiliate a person with a candidate. In addition, it enables like-minded persons to pool their resources in furtherance of common political goals. The Act's contribution ceilings thus limit one important means of associating with a candidate or committee . . . ." *Id.*, at 22.

That *Buckley* dealt with a contribution limitation rather than a contribution requirement does not alter its importance for this case. An individual can no more be required to affiliate with a candidate by making a contribution than he can be prohibited from such affiliation. The only question after *Buckley* is whether a union in the public sector is sufficiently distinguishable from a political candidate or committee to remove the withholding of financial contributions from First Amendment protection. In my view no principled distinction exists.

The ultimate objective of a union in the public sector, like that of a political party, is to influence public decisionmaking in accordance with the views and perceived interests of its membership. Whether a teachers' union is concerned with salaries and fringe benefits, teacher qualifications and in-service training, pupil-teacher ratios, length of the school day, student discipline, or the content of the high school curriculum, its objective is to bring school board policy and decisions into harmony with its own views. Similarly, to the extent that school board expenditures and policy are guided by decisions made by the municipal, State, and Federal Gov-

ernments, the union's objective is to obtain favorable decisions—and to place persons in positions of power who will be receptive to the union's viewpoint. In these respects, the public-sector union is indistinguishable from the traditional political party in this country.[10]

What distinguishes the public-sector union from the political party—and the distinction is a limited one—is that most of its members are employees who share similar economic interests and who may have a common professional perspective on some issues of public policy. Public school teachers, for example, have a common interest in fair teachers' salaries and reasonable pupil-teacher ratios. This suggests the possibility of a limited range of probable agreement among the class of individuals that a public-sector union is organized to represent. But I am unable to see why the likelihood of an area of consensus in the group should remove the protection of the First Amendment for the disagreements that inevitably will occur. Certainly, if individual teachers are ideologically opposed to public-sector unionism itself, as are the appellants in this case, *ante,* at 212–213, one would think that compelling them to affiliate with the union by contributing to it infringes their First Amendment rights to the same degree as compelling them to contribute to a political party. Under the First Amendment, the protection of speech does not turn on the likelihood or frequency of its occurrence.

Nor is there any basis here for distinguishing "collective-bargaining activities" from "political activities" so far as the interests protected by the First Amendment are concerned. Collective bargaining in the public sector is "political" in any meaningful sense of the word. This is most obvious when

---

[10] The leadership of the American Federation of Teachers, with which the local union involved in this case is affiliated, has apparently taken the position that collective bargaining should extend to every aspect of educational policy within the purview of the school board. See J. Weitzman, The Scope of Bargaining in Public Employment 85–88 (1975).

public-sector bargaining extends—as it may in Michigan [11]—to such matters of public policy as the educational philosophy that will inform the high school curriculum. But it is also true when public-sector bargaining focuses on such "bread and butter" issues as wages, hours, vacations, and pensions. Decisions on such issues will have a direct impact on the level of public services, priorities within state and municipal budgets, creation of bonded indebtedness, and tax rates. The cost of public education is normally the largest element of a county or municipal budget. Decisions reached through collective bargaining in the schools will affect not only the teachers and the quality of education, but also the taxpayers and the beneficiaries of other important public services. Under our democratic system of government, decisions on these critical issues of public policy have been entrusted to elected officials who ultimately are responsible to the voters.[12]

Disassociation with a public-sector union and the expression of disagreement with its positions and objectives therefore lie at "the core of those activities protected by the First Amendment." *Elrod* v. *Burns,* 427 U. S. 347, 356 (1976) (plurality opinion).

"Although First Amendment protections are not confined

---

[11] Michigan law requires public agencies to bargain with authorized unions on all "conditions of employment," Mich. Comp. Laws § 423.211 (1970), but does not limit the permissible scope of public-sector bargaining to such conditions.

[12] See Summers, *supra,* n. 8, at 672:

"The major decisions made in bargaining with public employees are inescapably political decisions. . . . Directly at issue are political questions of the size and allocation of the budget, the tax rates, the level of public services, and the long term obligations of the government. These decisions . . . are to be made by the political branches of government—by elected officials who are politically responsible to the voters. . . ."

See also *Hortonville School Dist.* v. *Hortonville Ed. Assn.,* 426 U. S. 482, 495 (1976); Wellington & Winter, Structuring Collective Bargaining in Public Employment, 79 Yale L. J. 805, 858–860 (1970).

to 'the exposition of ideas,' *Winters* v. *New York*, 333 U. S. 507, 510 (1948), 'there is practically universal agreement that a major purpose of th[e] Amendment was to protect the free discussion of governmental affairs . . . .' *Mills* v. *Alabama*, 384 U. S. 214, 218 (1966)." *Buckley*, 424 U. S., at 14.

As the public-sector agency shop unquestionably impinges upon the interests protected by the First Amendment, I turn to the justifications offered for it by the Detroit Board of Education.[13]

## B

"Neither the right to associate nor the right to participate in political activities is absolute . . . ." *CSC* v. *Letter Carriers*, 413 U. S. 548, 567 (1973). This is particularly true in the field of public employment, where "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering* v. *Board of Education*, 391 U. S. 563, 568 (1968). Nevertheless, even in public employment, "a significant impairment of First Amendment rights must survive exacting scrutiny." *Elrod* v. *Burns*, 427 U. S., at 362 (plurality opinion); accord, *id.*, at 381 (POWELL, J., dissenting).

"The [governmental] interest advanced must be paramount, one of vital importance, and the burden is on the

---

[13] Compelled support of a private association is fundamentally different from compelled support of government. Clearly, a local school board does not need to demonstrate a compelling state interest every time it spends a taxpayer's money in ways the taxpayer finds abhorrent. But the reason for permitting the government to compel the payment of taxes and to spend money on controversial projects is that the government is representative of the people. The same cannot be said of a union, which is representative only of one segment of the population, with certain common interests. The withholding of financial support is fully protected as speech in this context.

260

> government to show the existence of such an interest. . . . [C]are must be taken not to confuse the interest of partisan organizations with governmental interests. Only the latter will suffice. Moreover, . . . the government must 'emplo[y] means closely drawn to avoid unnecessary abridgment . . . .' *Buckley* v. *Valeo, supra,* at 25." *Id.,* at 362–363 (plurality opinion).

The justifications offered by the Detroit Board of Education must be tested under this settled standard of review.[14]

As the Court points out, *ante,* at 224–226, the interests advanced for the compulsory agency shop that the Detroit Board of Education has entered into are much the same as those advanced for federal legislation permitting voluntary agency-shop agreements in the private sector. The agency shop is said to be a necessary adjunct to the principle of exclusive union representation; it is said to reduce the risk that nonunion employees will become "free riders" by fairly distributing the costs of exclusive representation; and it is said to promote the cause of labor peace in the public sector. *Ante,* at 220–221. While these interests may well justify encouraging agency-shop arrangements in the private sector, there is far less reason to believe they justify the intrusion

---

[14] The Court's failure to apply the established First Amendment standards articulated in *Elrod* v. *Burns* and *Buckley* v. *Valeo* is difficult to explain in light of its concession that disassociation with a union's activities is entitled to full First Amendment protection regardless of whether those activities may be characterized as political. *Ante,* at 231–232, and n. 28. One may only surmise that those in the majority today who joined the plurality opinion in *Elrod* hold the unarticulated belief that compelled support of a public-sector union makes better public policy than compelled support of a political party. I am at a loss to understand why the State's decision to adopt the agency shop in the public sector should be worthy of greater deference, when challenged on First Amendment grounds, than its decision to adhere to the tradition of political patronage. See *Elrod,* 427 U. S., at 376–380, 382–387 (POWELL, J., dissenting).

upon First Amendment rights that results from compelled support for a union as a condition of government employment.

In *Madison School Dist.* v. *Wisconsin Employment Relations Comm'n,* 429 U. S. 167, 175 (1976), we expressly reserved judgment on the constitutional validity of the exclusivity principle in the public sector. The Court today decides this issue summarily:

> "The confusion and conflict that could arise if rival teachers' unions, holding quite different views as to the proper class hours, class sizes, holidays, tenure provisions, and grievance procedures, each sought to obtain the employer's agreement, are no different in kind from the evils that the exclusivity rule in the Railway Labor Act was designed to avoid." *Ante,* at 224.

I would have thought that "conflict" in ideas about the way in which government should operate was among the most fundamental values protected by the First Amendment. See *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 270 (1964). That the "Constitution does not require all public acts to be done in town meeting or an assembly of the whole," *Bi-Metallic Investment Co.* v. *State Bd. of Equalization,* 239 U. S. 441, 445 (1915), does not mean that a State or municipality may agree to set public policy on an unlimited range of issues in closed negotiations with "one category of interested individuals." *Madison School Dist., supra,* at 175. Such a commitment by a governmental body to exclude minority viewpoints from the councils of government would violate directly the principle that "government must afford all points of view an equal opportunity to be heard." *Police Dept. of Chicago* v. *Mosley,* 408 U. S. 92, 96 (1972).[15]

[15] By stressing the Union's duty of fair representation, *ante,* at 221–222, the Court may be suggesting that the State has provided an adequate means for minority viewpoints to be heard *within* the Union. But even if Michigan law could be read to impose a broad obligation on the union to listen to and represent the viewpoints of all employees on such issues as

The Court points out that the minority employee is not barred by the exclusivity principle from expressing his viewpoint, see *ante,* at 230.  In a limited sense, this may be true.  The minority employee is excluded in theory only from engaging in a meaningful dialogue with his employer on the subjects of collective bargaining, a dialogue that is reserved to the union.  It is possible that paramount governmental interests may be found—at least with respect to certain narrowly defined subjects of bargaining—that would support this restriction on First Amendment interests.  But "the burden is on the government to show the existence of such an interest." *Elrod* v. *Burns,* 427 U. S., at 362 (plurality opinion).  Because this appeal reaches this Court on a motion to dismiss, the record is barren of any demonstration by the State that excluding minority views from the processes by which governmental policy is made is necessary to serve overriding governmental objectives.  For the Court to sustain the exclusivity principle in the public sector in the absence of a carefully documented record is to ignore, rather than respect, "the importance of avoiding unnecessary decision of constitutional questions." *Ante,* at 236–237.

The same may be said of the asserted interests in eliminating the "free rider" effect and in preserving labor peace.  It may be that the Board of Education is in a position to demonstrate

---

curriculum reform, imposition of such an obligation on the Union could not relieve the school board of *its* responsibilities—at least, it could not do so unless the Union were declared to be a public agency to which the State had delegated some part of the school board's power.  Yet such a delegation of state power, covering an unlimited range of the school board's responsibility to set school policy, see nn. 10 and 11, *supra,* would itself raise grave constitutional issues.  If power to determine school policy were shifted in part from officials elected by the population of the school district to officials elected by the school board's employees, the voters of the district could complain with force and reason that their voting power and influence on the decisionmaking process had been unconstitutionally diluted.  See *Kramer* v. *Union School Dist.,* 395 U. S. 621 (1969); *Hadley* v. *Junior College Dist.,* 397 U. S. 50 (1970).

that these interests are of paramount importance and that requiring public employees to pay certain union fees and dues as a condition of employment is necessary to serve those interests under an exclusive bargaining scheme. On the present record there is no assurance whatever that this is the case.[16]

Before today it had been well established that when state law intrudes upon protected speech, the State itself must shoulder the burden of proving that its action is justified by overriding state interests. See *Elrod* v. *Burns, supra,* at 363; *Healy* v. *James,* 408 U. S. 169, 184 (1972); *Speiser* v. *Randall,* 357 U. S. 513, 525–526 (1958). The Court, for the first time in a First Amendment case, simply reverses this principle. Under today's decision, a nonunion employee who would vindi-

---

[16] Unions in the public sector may be expected to spend money in a broad variety of ways, some of which are more closely related to collective bargaining than others, and some of which are more likely to stimulate "ideological" opposition than others. With respect to many of these expenditures, arriving at the appropriate reconciliation of the employees' First Amendment interests with the asserted governmental interests will be difficult.

I should think that on some narrowly defined economic issues—teachers' salaries and pension benefits, for example—the case for requiring the teachers to speak through a single representative would be quite strong, while the concomitant limitation of First Amendment rights would be relatively insignificant. On such issues the case for requiring all teachers to contribute to the clearly identified costs of collective bargaining also would be strong, while the interest of the minority teacher, who is benefited directly, in withholding support would be comparatively weak. On other issues—including such questions as how best to educate the young—the strong First Amendment interests of dissenting employees might be expected to prevail.

The same may be said of union activities other than bargaining. The processing of individual grievances may be an important union service for which a fee could be exacted with minimal intrusion on First Amendment interests. But other union actions—such as a strike against a public agency—may be so controversial and of such general public concern that compelled financial support by all employees should not be permitted under the Constitution.

cate his First Amendment rights apparently must initiate a proceeding to prove that the union has allocated some portion of its budget to "ideological activities unrelated to collective bargaining." *Ante,* at 237–241. I would adhere to established First Amendment principles and require the State to come forward and demonstrate, as to each union expenditure for which it would exact support from minority employees, that the compelled contribution is necessary to serve overriding governmental objectives. This placement of the burden of litigation, not the Court's, gives appropriate protection to First Amendment rights without sacrificing ends of government that may be deemed important.