John CROSETTO, et al., Plaintiffs,

v.

HEFFERNAN, et al., Defendants.

No. 88 C 433 C.

United States District Court,
N.D. Illinois, W.D.

Oct. 22, 1992.

See also 771 F.Supp. 224.

Amedeo Greco, Madison, WI, for plaintiffs.

John S. Skilton, Foley & Lardner, Madison, WI, for defendants.

## ORDER

ROSZKOWSKI, District Judge.

Having considered the entire record in this matter as well as the Magistrate Judge's report and recommendation and Plaintiffs' objections thereto and having been involved in this case for over three years, the court adopts the Magistrate Judge's recommendation that Defendants' motion for summary judgment be granted and Plaintiffs' second motion for a preliminary injunction be denied. All other pending motions are rendered moot. This cause of action is hereby dismissed.

## REPORT AND RECOMMENDATION

MAHONEY, United States Magistrate Judge.

Before the court are assorted motions (twelve to be exact) in various stages of briefing. The district court has referred this case to the Magistrate Judge for a report and recommendation. For the reasons set forth herein, it is the report and recommendation of the Magistrate that Defendants' motion for summary judgment be granted and Plaintiffs' second motion for a preliminary injunction be denied. All others matters are, therefore, rendered moot.

## BACKGROUND

Plaintiffs, John Crosetto, Kenneth J. Doran, Scott N. Herrick and Douglas W. Kammer, are attorneys licensed to practice law in the State of Wisconsin. Defendant, the State Bar of Wisconsin, is an association of lawyers headquartered in Madison, Wisconsin. Defendant, Stephen L. Smay, is the Executive Director of the State Bar of Wisconsin. Plaintiffs filed suit in the United States District Court, Western District of Wisconsin on May 19, 1988 seeking declaratory and injunctive relief as well as monetary and punitive damages for alleged violations of 42 U.S.C. § 1983. Plaintiffs allegations will be set out more fully below.

On June 15, 1989 this cause of action was ordered reassigned to a District Court Judge who was not sitting in Wisconsin and who had no membership ties to the Wisconsin State Bar Association. Hence, this case was reassigned to this court on June 22, 1989. Jurisdiction of this court is based upon 42 U.S.C. § 1983 and 28 U.S.C. § 1442(a)(3). In February of 1991, both the District Court Judge and the Magistrate informed the parties to this cause of action that the Local Rules of the Northern District of Illinois would apply in this case.

The court notes initially that Plaintiffs have failed to file a Local Rule 12(n) response to Defendants' Local Rule 12(m) statement of facts. Under Rule 12(n), a party opposing a motion for summary judgment must "state separately and with supporting documentation his disagreement with any factual assertions in the [moving party's statement of facts] on pain of having the asserted facts deemed admitted." *Maksym v. Loesch,* 937 F.2d 1237, 1240 (7th Cir.1991); *Cooper v. Lane,* 969 F.2d 368 (7th Cir.1992). Nevertheless, in order to dispose of this case that has generated innumerable documents and has taken this court's time for over three years, the court will overlook Plaintiffs' failing and proceed to the merits of the case. In doing so, the court will try and work with Plaintiffs' somewhat jumbled statement of facts set forth in Plaintiffs' response to Defendants' motion for summary judgment as well as with Defendants' Local Rule 12(m) statement and Defendants' brief in support of their motion for summary judgment.

In 1943, the Wisconsin legislature enacted a bill directing that there "shall be an association to be known as the 'State Bar of Wisconsin' composed of persons licensed to practice law in [Wisconsin], and membership in the association [was to] be a condition precedent to the right to practice law in Wisconsin." Ch. 315, 1943 Wis.Laws (codified as Wis.Stat. § 256.31 (1943)). The Wisconsin Supreme Court construed the statute as an advisory legislative declaration that integration of the Bar would promote the general welfare of the State. *Integration of Bar Case,* 244 Wis. 8, 11 N.W.2d 604 (1943).[1] The court acknowledged its authority and responsibility to regulate the practice of law in the State and its discretionary power as to both the time and form of integration. The court nevertheless deferred the decision to integrate.

Three years later, in a short opinion, the Wisconsin Supreme Court again declined to integrate the Bar. The court intimated that the objectives sought to be obtained by integration could be attained by an adequately supported voluntary association. As such, the court urged the support of the voluntary association by individual members of the Bar. *In re Integration of the Bar,* 249 Wis. 523, 25 N.W.2d 500 (1946).

Ten years passed. The Wisconsin Supreme Court once again reviewed its decision regarding integration in *In the Matter of the Integration of the Bar,* 273 Wis. 281, 77 N.W.2d 602 (1956). The court noted that "too many lawyers have refrained or refused to join [the voluntary association], that membership in the voluntary association has become static, and that a substantial minority of the lawyers in the state are not associated with the State Bar Association." *Id.* at 603. Accordingly, following a review of the merits of integration,

---

1. An "integrated bar" is "an association of attorneys in which membership and dues are required as a condition of practicing law" in a State. *Keller v. State Bar of California,* 496 U.S. 1, 2, 110 S.Ct. 2228, 2229, 110 L.Ed.2d 1 (1990).

the court ordered integration of the Bar on an interim basis. *Id.* at 604.

After a "two-year trial period", the Wisconsin Supreme Court made the integrated State Bar "permanent". *In re Integration of the Bar,* 93 N.W.2d 601 (1958). In reaching this result, the court noted that "[u]nder integration the State Bar has increased its services to the lawyers of this state, promoted the high standards of the members of the profession, and increased its contribution to public service and to the administration of law and justice." *Id.* at 602. In answer to the suggestion that integration of the Bar was undemocratic, the court observed:

> It is not undemocratic to require those who are privileged to practice law and are entrusted with the duty to secure or protect the property, rights and liberties of others to become bound together in a united effort to increase their own capabilities, to maintain the high standards of the group and to increase the effectiveness of their service to the public. The integrated Bar has been defined as "the process by which every member of the Bar is given an opportunity to do his share in carrying out the public service of the Bar and obliged to bear his portion of the responsibility." Most objections have centered around the obligation to bear a portion of their responsibility. In the nature of things every privilege has a correlative obligation.

*Id.* at 603.

In 1960, the Wisconsin Supreme Court had occasion to review the constitutionality of the integrated State Bar. In *Lathrop v. Donohue,* 10 Wis.2d 230, 102 N.W.2d 404 (1960), the court upheld the Bar's constitutionality explaining that "[t]he only limitation upon the state's power to regulate the privilege of the practice of law is that the regulations adopted do not impose an unconstitutional burden or deny due process." *Id.* at 408. The court recognized that "the State Bar is a public and not a private agency." *Id.* at 411. As such, the court found that the integration rule and the by-laws of the State Bar "do not compel the plaintiff to associate with anyone[,] ...

[t]he only compulsion to which he has been subjected by the integration of the bar is the payment of the annual dues...." *Id.* at 408. The court explained that "the dues payable by a lawyer to an integrated bar imposed by state action are in the same category as an annual license fee imposed upon any occupation or profession which is subject to state regulation." *Id.* Finally, noting the benefits of the integrated Bar, including its function of "securing and publicizing the composite judgment of the members of the bar of the state on measures directly affecting the administration of justice and the practice of law," the court determined that an integrated Bar promotes the public interest in a way that "far outweighs the slight inconvenience to the plaintiff resulting from his required payment of the annual dues." *Id.* at 409, 411.

The United States Supreme Court reviewed the Wisconsin Supreme Court's decision. In *Lathrop v. Donohue,* 367 U.S. 820, 81 S.Ct. 1826, 6 L.Ed.2d 1191 (1961), the U.S. Supreme Court upheld the mandatory membership requirement. In so doing, the Court stated:

> Both in purport and in practice the bulk of State Bar activities serve the function, or at least so Wisconsin might reasonably believe, of elevating the educational and ethical standards of the Bar to the end of improving the quality of the legal service available to the people of the State, without any reference to the political process. It cannot be denied that this is a legitimate end of state policy. We think that the Supreme Court of Wisconsin, in order to further the State's legitimate interests in raising the quality of professional services, may constitutionally require that the costs of improving the profession in this fashion should be shared by the subjects and beneficiaries of the regulatory program, the lawyers, even though the organization created to attain the objective also engages in some legislative activity.

*Id.* at 843, 81 S.Ct. at 1838 (plurality opinion) (footnote omitted).

A plurality of the Court (Justices Brennan, Clark, Stewart and Chief Justice Warren), however, found the record inadequate to decide the narrower issue of whether certain of the Bar's "political" activities violated the plaintiff's First Amendment rights. Three Justices (Harlan, Frankfurter and Whittaker) concurred in the result, but rejected the notion that mandatory bar dues, even if used on legislative matters, could ever constitute a violation of a dissenting Bar member's constitutional rights. In fact, Justice Harlan, joined by Justice Frankfurter, wrote:

> I can only regard as entirely gratuitous a contention that there is anything less than a most substantial state interest in Wisconsin having the views of the members of its Bar "on measures directly affecting the administration of justice and the practice of law."

*Id.* at 864, 81 S.Ct. at 1849 (Harlan, J., concurring).

Since *Lathrop,* the structure, purposes and activities of the Wisconsin State Bar have undergone repeated review by the Wisconsin Supreme Court and by special committees the court appointed for the purpose of review. In July of 1976, for example, the Wisconsin Supreme Court appointed a committee, chaired by Judge Andrew Parnell (hereinafter "the Parnell Committee"), to study and report on the Bar's activities and on the question of whether to continue integration of the Bar. The Parnell Committee submitted its findings and report to the Wisconsin Supreme Court.

The Wisconsin Supreme Court delivered its opinion on the Parnell Committee's report in *In re Regulation of the Bar of Wisconsin,* 81 Wis.2d xxxv (1978). The court agreed with the Committee's reasons for recommending continuation of the integrated Bar, namely: "(1) mandatory membership and dues give the best assurance that the Bar will have the resources necessary to carry out its programs and (2) each attorney has an individual obligation to support the bar in fulfilling its collective responsibilities to society, and the unified Bar is the best means to accomplish this." *Id.* at xxxvi. Commenting on the Parnell Committee resolutions, the court expressed approval of the Bar's legislative activities, including "traditional lobbying." *Id.* The court, however, advised the State Bar to bring "major issues of legislative policy" before the membership at annual and midwinter meetings, whenever possible. Finally, recognizing the presence of "issues raised in *Lathrop,*" the court delineated the Bar's authority in legislative activities to include "matters concerning the administration of justice and the practice of law, including matters of substantive law on which the views of lawyers have special relevance. The guiding princip[le] ... must always be the public interest." *Id.* at xxxix–xi.

In 1979, in the case of *State ex rel. Armstrong v. Board of Governors,* 86 Wis.2d 746, 273 N.W.2d 356 (1979), certain State Bar members requested a referendum on continued integration. The Wisconsin Supreme Court rejected this request and reaffirmed its exclusive authority over the matter of integration of the Bar.

The Wisconsin Supreme Court again addressed the issue of the integrated Bar in *In the Matter of the Discontinuation of the State Bar of Wisconsin as an Integrated Bar,* 93 Wis.2d 385, 286 N.W.2d 601 (1980). Oral argument was held on this matter and several State Bar members appeared and argued against continued integration. Following oral argument, the court again reaffirmed its approval of the Bar's activities and rejected the petitioners' request to make the State Bar of Wisconsin voluntary.

The court did, however, express hesitance about the State Bar's involvement with the Wisconsin Lawyers Political Action Committee (hereinafter "LAWPAC"). LAWPAC was a separately formed political action committee that permitted members of the State Bar to voluntarily contribute financially in order to express political views. *Id.* at 602 (noting that LAWPAC was "organized as a voluntary, non-profit, unincorporated political association ... not supported by State Bar membership dues"). The court ordered that a second committee be formed in order to study the

propriety of mandatory membership, whether the Bar's involvement with LAW-PAC was permissible and the possible alternatives to the integrated bar. *Id.* at 603. The committee, chaired by Attorney John Kelly (hereinafter "the Kelly Committee"), submitted its report to the Wisconsin Supreme Court on October 1, 1982.

Following a public hearing on the Kelly Committee's report, the court, for a third time, reaffirmed its commitment to the integration of the Wisconsin State Bar. *Report of Committee to Review the State Bar*, 334 N.W.2d 544 (Wis.1983). The Wisconsin Supreme Court explained that mandatory support of the Bar's public purposes is proper and that the unified Bar is "better suited than a voluntary bar to accomplish [these public purposes]." *Id.* at 546. The court stated that "it is our opinion, as it has been for more than 25 years, that a bar association in which membership is mandatory is the best means for the profession to fulfill its obligations to the public." *Id.* at 546–547. Accordingly, the court rejected the proposal of a voluntary bar as not a "practicable alternative." *Id.*

In relation to the Bar's legislative activities, the Wisconsin Supreme Court reiterated its approval of the Parnell Committee resolutions. The court declined to require that the Board of Governors obtain a specified percentage of membership support prior to taking a position on particular legislation. The court deemed it preferable that the Board attempt to determine the composite judgment of the members of the Bar. *Id.* at 547–48.

The court did, however, order that the Bar disassociate itself from LAWPAC and ordered the State Bar to institute a system of rebates for State Bar lobbying activities. In so doing, the Wisconsin Supreme Court approved the concept of a dues rebate procedure for those members dissenting from legislative positions taken by the State Bar. The court considered the rebate procedure to be "an acceptable and adequate response to any claimed infringement on the rights of those association members who oppose the association's position on specific legislation." *Id.* at 548. The court did recognize that the Bar's involvement in the legislative arena raised the specter of potential infringement of an individual attorney's constitutional rights. The court, however, did not find that any infringement had, in fact, occurred. The rebate procedure was simply viewed as a preventive measure. *Id.* at 548.

The Wisconsin Supreme Court did not specify how the rebate procedure was to be implemented. Instead, the court ordered public hearings to be held on the matter, the first of which was held on September 17, 1984. *In the Matter of the Amendment of State Bar Rules: SCR 10.03(5)*, slip op. (Wis.Sup.Ct. Jan. 21, 1986). On February 28, 1985, the court ordered the Bar to consider four alternative rebate plans. An additional hearing was then held on May 23, 1985. *Id.* Ultimately, the court adopted a "dues reduction" plan that permitted objectors to deduct their pro rata share of Bar dues expended for legislative activities at the outset of each fiscal year. *Id.* Such a plan was thought to be consistent with the United States Supreme Court's decision in *Ellis v. Brotherhood of Ry. Clerks*, 466 U.S. 435, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984).

Wisconsin Supreme Court Rule 10.-03(5)(b) became effective July 1, 1986 and provided as follows:

1. In this paragraph, "legislative activities" means activities intended to advocate a position of the state bar with respect to contemplated, pending or existing legislation. "Legislative activities" does not include the review and analysis of contemplated, pending or existing legislation not intended to influence that legislation.

2. Prior to the beginning of each fiscal year, the state bar shall establish, as a part of its annual budget for that year, a budget specifically for legislative activities for that year and shall set forth in the dues statement it sends to its members for that year each member's pro rata portion, according to class of membership, of the amount budgeted for legislative activities.

3. A member of the state bar may deduct from the mandatory dues payable for each fiscal year the member's pro rata portion of the amount budgeted for legislative activities, and the state bar's established budget for legislative activities for each fiscal year shall be reduced by the total amount of mandatory dues deducted by members for that year.

4. A member of the state bar not required to pay dues shall be given the opportunity at the beginning of each fiscal year to indicate on a form supplied by the state bar whether or not the member approves of the state bar's legislative activities for that year.

On April 19, 1986, in response to *Chicago Teachers Union, Local No. 1 v. Hudson*, 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986), the State Bar's Board of Governors also passed a by-law providing for an arbitration proceeding in the event a dispute arose between the Bar and a member concerning the allocation of expenditures to "legislative activities" as defined under the above cited Supreme Court Rule. This procedure was approved by the Wisconsin Supreme Court in *Petition to Review State Bar Bylaw Amendments*, 139 Wis.2d 686, 407 N.W.2d 923 (1987). Although a number of State Bar members opposed such a proceeding, the court found that the State Bar by-law established a mechanism to resolve any dispute with respect to the calculation of dues reductions for "legislative activities" under the Supreme Court Rule. As such, the arbitration proceeding satisfied the constitutional requirements set forth in *Chicago Teachers Union v. Hudson*. *Id.* at 925–927.

In 1988, United States District Court Judge Barbara Crabb declared unconstitutional the Wisconsin Supreme Court Rule that required membership in the State Bar of Wisconsin as a condition of the right to practice law in that State. Judge Crabb held that the membership requirement violated the First Amendment to the United States Constitution. *Levine v. Supreme Court of Wisconsin*, 679 F.Supp. 1478 (W.D.Wis.1988). In the wake of Judge Crabb's decision in *Levine*, the Wisconsin Supreme Court suspended enforcement of the mandatory membership rule on May 26, 1988.

The Seventh Circuit Court of Appeals subsequently reversed Judge Crabb's decision. *Levine v. Heffernan*, 864 F.2d 457 (7th Cir.1988), *cert. denied*, 493 U.S. 873, 110 S.Ct. 204, 107 L.Ed.2d 157 (1989). The Seventh Circuit specifically rejected Judge Crabb's conclusion that the United States Supreme Court's decision in *Lathrop v. Donohue*, 367 U.S. 820, 81 S.Ct. 1826, 6 L.Ed.2d 1191 (1961), was no longer controlling on the issue of the constitutionality of Wisconsin's integrated Bar rule. As such, the Seventh Circuit remanded the case to the district court for further proceedings. Nevertheless, suspension of the mandatory membership requirement for the Wisconsin State Bar remained in effect.

On the same day that certiorari in *Levine* was denied, the United States Supreme Court granted a petition for certiorari in *Keller v. State Bar of California*, 493 U.S. 806, 110 S.Ct. 46, 107 L.Ed.2d 15 (1989). In *Keller*, the plaintiffs challenged the expenditure by the California Bar of mandatory Bar dues for political and ideological activities, including lobbying, amicus curiae briefs and election campaign activities. The California Supreme Court had held that, as a governmental agency, the California Bar could use funds derived from mandatory dues for any activity within its statutory authority without infringing the plaintiffs' First Amendment rights. *Keller v. State Bar of California*, 47 Cal.3d 1152, 255 Cal.Rptr. 542, 552, 767 P.2d 1020, 1030 (1989).

On June 4, 1990, the United States Supreme Court issued its decision in *Keller*, 496 U.S. 1, 110 S.Ct. 2228, 110 L.Ed.2d 1 (1990). Citing *Lathrop*, the Court reaffirmed the Constitutionality of the integrated Bar. *Id.* 496 U.S. at 6–8, at 2232–33. The Court then held that the analysis set forth in its union and agency shop cases (*e.g.*, *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261

(1977) [2]) applied to integrated Bars. *Id.* 496 U.S. at 11–17, at 2235–38. The Court ruled that an integrated Bar may "constitutionally fund activities germane to [the] goals [of regulating the legal profession and improving the quality of legal services] out of the mandatory dues of all members. It may not, however, in such manner fund activities of an ideological nature which fall outside those areas of activity." *Id.* 496 U.S. at 13–15, 110 S.Ct. at 2236. Finally, the Court noted that "an integrated bar could certainly meet its *Abood* obligation [not to fund non-germane ideological activities with mandatory dues] by adopting the sort of procedures described in [*Chicago Teachers Union, Local No. 1 v.] Hudson* [, 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986) ]." *Id.* 496 U.S. at 15–17, 110 S.Ct. at 2237.

Following the *Keller* decision, Judge Crabb dismissed the *Levine* case, which had been stayed pending the U.S. Supreme Court's ruling in *Keller,* by granting the Wisconsin State Bar's motion for summary judgment. Judge Crabb reasoned that the plaintiffs' claims in *Levine,* which by that time concerned only claims for prospective relief, were not ripe for decision. This was so because the State Bar had been voluntary since shortly after the original decision in *Levine* and because any rebate procedure that may be put into effect if the State Bar returned to mandatory status would probably be unobjectionable. *Levine v. Heffernan,* No. 86–C–578–C (W.D.Wis. Feb. 21, 1991).

On September 14, 1990, the Board of Governors of the Wisconsin State Bar approved a process that would result in a petition to the Wisconsin Supreme Court concerning the Bar's status. Two committees were appointed, each charged with preparing a draft petition for review by the Board of Governors. One committee was to prepare a petition seeking to amend Supreme Court Rules and State by-laws to make the State Bar a voluntary organization; the other to reinstate the State Bar as a mandatory organization.

On March 22, 1991, the State Bar's Board of Governors voted to petition the Wisconsin Supreme Court to return the Bar to mandatory status and directed that a petition be prepared consistent with *Keller.* Following a public hearing in this matter on March 13, 1992, the Wisconsin Supreme Court reestablished the mandatory Bar effective July 1, 1992 under a set of newly-issued Wisconsin Supreme Court rules and State Bar by-laws. During the public hearing, an overwhelming majority of those who spoke did so in favor of reintegration. Only one person spoke in opposition to the petition.

The newly enacted Wisconsin Supreme Court Rule 10.03(5)(b) provides as follows:

1. The State Bar may use compulsory dues only for activities reasonably intended for the purpose of regulating the legal profession or improving the quality of legal services offered by members of the State Bar. Other activities must be supported by voluntary dues, user fees or other sources of revenue.

2. Prior to the beginning of each fiscal year, the State Bar shall publish written notice of the activities that can be supported by compulsory dues and the activities that cannot be supported by compulsory dues. The notice shall indicate the cost of each activity including all appropriate indirect expense and the amount of dues to be devoted to each activity. The notice shall set forth each member's pro rata portion, according to the class of membership, of the dues to be devoted to activities that cannot be supported by compulsory dues. The notice shall be sent to every member of the State Bar along with the annual dues notice. A member of the State Bar may withhold

---

**2.** *Abood* held that while the Constitution did not prohibit a union from spending "funds for the expression of political views ... or toward the advancement of other ideological causes not germane to its duties as collective-bargaining representative", the Constitution did require that such expenditures be "financed from charges, dues, or assessments paid by employees who [did] not object to advancing those ideas and who [were] not coerced into doing so against their will by the threat of loss of governmental employment." 431 U.S. at 235–236, 97 S.Ct. at 1799.

the pro rata portion of dues budgeted for activities that cannot be supported by compulsory dues.

3. A member of the State Bar who contends that the State Bar incorrectly set the amount of dues that can be withheld may deliver to the State Bar a written demand for arbitration. Any such demand shall be delivered within 30 days of receipt of the member's dues statement.

4. If one or more timely demands for arbitration are delivered, the State Bar shall promptly submit the matter to arbitration before an impartial arbitrator. All such demands for arbitration shall be consolidated for hearing. The costs of the arbitration shall be paid by the State Bar.

5. In the event the decision of the arbitrator results in a higher pro rata reduction of dues for members who have delivered timely demands for arbitration for a fiscal year, the State Bar shall offer such higher pro rata reduction for members first admitted to the State Bar during that fiscal year and after the date of the arbitrator's decision.

In returning to the mandatory Bar, the Board of Governors affirmed an arbitration by-law that had been proposed with the new rules presented to the Wisconsin Supreme Court. The State Bar's Executive Committee also adopted principles to guide the Bar in identifying chargeable and non-chargeable expenditures.

On June 12, 1992, the dues statements for fiscal year 1993 were sent to members. The amount of dues reduction was determined by the State Bar to be $2.21 for each full dues-paying member. Nevertheless, the Executive Committee recommended, and the Board of Governors adopted, a $5.00 dues reduction in order to alleviate any errors in making the chargeable/non-chargeable determination. Included with the statements was a six page notice describing the new rules, the calculation of the dues reduction amount and the procedure for challenging the calculation.

## PENDING MOTIONS

Various motions are currently pending before this court. Included in these motions are: Plaintiffs' motion to vacate order denying class certification; Plaintiffs' motion to strike insufficient defenses; Plaintiffs' motion for a preliminary injunction; Defendants' motion for summary judgment; Plaintiffs' motion for declaratory ruling; Plaintiffs' motion to reopen discovery; Plaintiffs' motion for production of documents; Plaintiffs' motion for sanctions; Defendants' motion for sanctions; Plaintiffs' second motion for sanctions; Plaintiffs' second motion for a preliminary injunction; and Plaintiffs' motion to amend the pretrial order. As Defendants' motion for summary judgment is dispositive of the issues in this case, the Magistrate Judge will take up this motion first.

## DISCUSSION

This court will not grant any summary judgment motion unless all of the pleadings and supporting documents, if any, indicate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Fitzsimmons v. Best*, 528 F.2d 692, 694 (7th Cir.1976). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The district court, however, is not required to evaluate every conceivable inference that can be drawn from evidentiary matters, but only reasonable ones. *Parker v. Federal Nat'l Mortgage Ass'n*, 741 F.2d 975, 980 (7th Cir.1984).

The party seeking summary judgment bears the initial burden of establishing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Dowden v. Polymer Raymond, Inc.*, 966 F.2d 1206 (7th Cir.1992). Once the moving party has supported its motion, the non-moving party has the responsibility

of going beyond the pleadings and setting forth specific facts demonstrating the existence of a genuine issue of fact for trial. *Whetstine v. Gates Rubber Co.*, 895 F.2d 388, 392 (7th Cir.1990). "A material fact must be 'outcome determinative under the governing law.'" *Id., quoting, Shlay v. Montgomery*, 802 F.2d 918, 920 (7th Cir. 1986). Furthermore, a party opposing a motion for summary judgment must do more than simply show that there is some "metaphysical doubt" as to the material fact(s). *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

## I. Damages

Defendants characterize Plaintiffs' complaint as "a rambling, disjointed attack on virtually all State Bar activities since 1978." Indeed, even Judge Crabb described Plaintiffs' complaint as "somewhat prolix and disjointed". Judge Crabb, however, attempted to summarize Plaintiffs' claims as follows:

> [T]hat their First Amendment rights have been violated by Wisconsin's requirement that they belong to the State Bar if they wish to practice law in the state, by the State Bar's refusal prior to 1986 to refund to members that portion of their membership dues that were used for the State Bar's legislative activities, and by the State Bar's refusal since 1986 to refund to members that portion of their membership dues that are used for "technical" legislative expenses.[3]

Plaintiffs seek, in part, "out-of-pocket compensatory damages of about $500,000" allegedly spent on "legislative activities" from August 12, 1980 to the present and punitive damages of $600,000 for alleged reckless disregard of Plaintiffs' First Amendment rights. Defendants assert the defense of qualified immunity in relation to these allegations and claims for damages.

■ The issue as to whether a defendant is entitled to qualified immunity is a legal issue to be decided by the court and not by a jury. *Mitchell v. Forsyth*, 472 U.S. 511, 528 n. 9, 530, 105 S.Ct. 2806, 2816–17 n. 9, 2817–18, 86 L.Ed.2d 411 (1985). "[A] court considering a motion for summary judgment based on qualified immunity has before it a pure question of law: whether, based on all the undisputed facts, the defendant's conduct violated any clearly established constitutional or statutory right." *Green v. Carlson*, 826 F.2d 647, 652 (7th Cir.1987).

■ As explained in the United States Supreme Court case of *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), two types of immunity defenses exist. First, there is the defense of "absolute immunity" that is available to those officials whose special functions or constitutional status requires complete protection from suit. *Id.* at 807, 102 S.Ct. at 2732. The second type of immunity defense is "qualified immunity" which exists for executive officials in general. This type of immunity reflects an attempt to balance competing values; namely, "the importance of a damages remedy to protect the rights of citizens" and the need to "protect officials who are required to exercise their discretionary functions," including the "related public interest in encouraging the vigorous exercise of official authority." *Id.* Qualified immunity is the norm. *Id.* The presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties. *Burns v. Reed*, ——— U.S. ———, ———, 111 S.Ct. 1934, 1939, 114 L.Ed.2d 547 (1991).

■ The defense of qualified immunity is available to public officials. *Abel v. Miller*, 824 F.2d 1522, 1530 (7th Cir.1987). The defense is intended to provide public officials with the ability to "reasonably anticipate when their conduct may give rise to liability for damages." *Anderson v. Creighton*, 483 U.S. 635, 646, 107 S.Ct. 3034, 3042, 97 L.Ed.2d 523 (1987). The doctrine of qualified immunity extends to individuals as well as to the institutions for

---

3. Although Plaintiffs have now been granted leave to file four amended complaints since Judge Crabb's description of Plaintiffs' allega- tions, the Magistrate believes Judge Crabb's summary is still apropos.

whom these individuals work. *Abel v. Miller,* 824 F.2d 1522, 1530 (7th Cir.1987). In *Werle v. Rhode Island Bar Ass'n,* 755 F.2d 195 (1st Cir.1985), the First Circuit Appellate Court held that the defense of qualified immunity is available to a Bar Association.

■ Qualified immunity has two prongs. First, is the objective prong and it involves a presumptive knowledge of and respect for "basic, unquestioned constitutional rights." *Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 1001, 43 L.Ed.2d 214 (1975). Second, is the subjective prong and it involves "permissible intentions." *Id.* The U.S. Supreme Court has defined these prongs by identifying the circumstances in which qualified immunity would *not* be available. The Court has held that qualified immunity would be defeated if an official "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiffs], or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury. . . ." *Id.*

In *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court explained that defendants in a § 1983 lawsuit "are shielded from liability" by the doctrine of qualified immunity "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738. Accordingly, where the defense of qualified immunity is properly raised, the plaintiff "bears the burden of establishing the existence of the allegedly clearly established constitutional right." *Rakovich v. Wade,* 850 F.2d 1180, 1209 (7th Cir.), *cert. denied,* 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988).

The *Harlow* Court, however, did not explain what it meant by the phrase "clearly established statutory or constitutional rights". *Benson v. Allphin,* 786 F.2d 268, 275 (7th Cir.), *cert. denied,* 479 U.S. 848, 107 S.Ct. 172, 93 L.Ed.2d 109 (1986). Subsequent U.S. Supreme Court and Seventh Circuit decisions have, however, interpreted the meaning of that phrase. In *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987), the Supreme Court explained that the cases construing *Harlow* "establish that the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." In other words, "in light of pre-existing law the unlawfulness must be apparent." *Id.* As pointedly stated by the Supreme Court in *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986), the defense of qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law."

The Seventh Circuit Court of Appeals has articulated what a plaintiff must demonstrate in order to prove that his rights were "clearly established." "While cases involving the exact fact pattern" are unnecessary, *Lojuk v. Johnson,* 770 F.2d 619, 628 (7th Cir.1985), *cert. denied,* 474 U.S. 1067, 106 S.Ct. 822, 88 L.Ed.2d 795 (1986), "what is required is a 'sufficient consensus,' based on all relevant case law, 'indicating that the official's conduct was unlawful.'" *Landstrom v. Illinois Dep't of Children & Family Serv.,* 892 F.2d 670, 676 (7th Cir.1990) (citation omitted).

■ The Magistrate is of the opinion that Defendants violated no clearly established First Amendment rights. The alleged constitutional rights that Plaintiffs allege were violated were not clearly established prior to the State Bar's suspension of the mandatory bar rule on July 1, 1988. In fact, prior to the U.S. Supreme Court's decision in *Keller v. State Bar of California,* even the basic issue of the applicability of the First Amendment to lawyers in an integrated bar was open to question. Prior to *Keller, Lathrop* was "the last Supreme Court decision squarely to address the [F]irst [A]mendment rights of lawyers in an integrated bar." *Gibson v. Florida Bar,* 798 F.2d 1564 (11th Cir.1986), *cert.*

*dismissed,* — U.S. ——, 112 S.Ct. 633, 116 L.Ed.2d 432 (1991). The *Lathrop* Court upheld the mandatory membership requirement but expressly declined to consider whether the First Amendment might be implicated by an integrated bar's use of mandatory dues to support its legislative program. Accordingly, the U.S. Supreme Court "establish[ed] *for the first time* [in *Keller*] that the principles it previously had developed for the permissible use of compulsory union dues are equally applicable for the use of mandatory bar dues." *Schneider v. Colegio de Abogados de Puerto Rico,* 917 F.2d 620, 624 (1st Cir. 1990), *cert. denied,* — U.S. ——, 112 S.Ct. 865, 116 L.Ed.2d 772 (1992) (emphasis added).[4]

■■■ Plaintiffs assert that Defendants have lost any claim they may have to qualified immunity by "deliberately flaunting" the express commands of the Wisconsin Supreme Court that they not engage in any political activity such as LAWPAC. Plaintiffs contend that, despite the court's admonitions, Defendants controlled and ran LAWPAC from their offices, forced Plaintiffs to support LAWPAC, tried to conceal their relationship to LAWPAC and deliberately misrepresented to the Wisconsin Supreme Court that they had severed all ties to LAWPAC.

Defendants have provided this court with the affidavit of Defendant Stephen L. Smay stating that Defendants severed all ties with LAWPAC in 1983. Plaintiffs have attempted to contradict Defendants' assertion by supplying the court with a copy of a memorandum dated July 19, 1983 from Defendant Smay to the State Bar's Executive Committee indicating that the State Bar had contacted LAWPAC about a contribution on behalf of a lobbyist and was advised no contribution could be made. Plaintiffs have also supplied the court with copies of some bank statements indicating that LAWPAC's bank statements still re-

flected the State Bar address through January 1, 1985.

The Magistrate finds that Plaintiffs' submissions do not negate Defendants' qualified immunity defense by showing, in essence, a lack of good faith on the part of Defendants. The memorandum was simply Defendant Smay's response to the Executive Committee's inquiry as to the feasibility of a LAWPAC contribution. Defendant Smay informed the Executive Committee that such a contribution was beyond LAWPAC's authority. Defendant Smay further offered to meet with the members of the Executive Committee in order to determine if this matter should be on the Board agenda or if the "issue of extraordinary majority vote requirements on legislative issues" should be discussed prior to "becoming ensnarled in the specifics of any one issue." As to the bank statements with LAWPAC's address listed as the Wisconsin State Bar's office, the court notes that these statements reflect no activity on the accounts whatsoever from January of 1984 to January of 1985.

The Magistrate finds rather, Plaintiffs' submission of a letter from Defendant Smay to Chief Justice Beilfuss of the Wisconsin Supreme Court dated May 20, 1983 and copied to Amedeo Greco, Plaintiffs' attorney, more helpful in resolving the issue of Defendants' good faith. That letter assured the Wisconsin Supreme Court that the State Bar was moving to sever all ties with LAWPAC. The letter pointed out the difficulties in finding alternative administrative sources for LAWPAC, including the removing of files from the State Bar's office and the finding of a new administrator. Defendant Smay stated that "any activity devoted by State Bar staff to LAWPAC is of the minimum maintenance type." Defendant Smay encouraged the court and Mr. Greco to visit with him regarding the difficulties in divesting the State Bar from any tie to LAWPAC. In concluding his letter, Defendant Smay noted that the 1984 dues statement makes no mention of LAW-

---

**4.** Plaintiffs themselves admit that in *Keller* the U.S. Supreme Court, "for the first time ... squarely ruled that unified bar associations act unlawfully when they force their members to

financially support certain legislative activities ..." Plaintiffs' brief in opposition to Defendants' motion for summary judgment, pg. 42.

PAC nor does the statement attempt to collect any contributions for LAWPAC.

The Magistrate believes that this minimum tie to LAWPAC during the early stages of divesting the State Bar from, what was once, an integral part of the Wisconsin State Bar fails to establish any lack of objective good faith on Defendants' part. This cause of action has undergone four years of discovery. In that time Plaintiffs have failed to come forward with any, what the Magistrate considers to be, real evidence of an actual, continuing relationship between LAWPAC and the Wisconsin State Bar. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Valentine v. Joliet Township High School Dist. No. 204*, 802 F.2d 981, 986 (7th Cir.1986) (citation omitted).

Plaintiffs also are critical of the timekeeping records maintained by the State Bar for LAWPAC activities. Plaintiffs assert that these records should have been more detailed and should have been maintained on a daily basis.[5] Plaintiffs further contend that the State Bar's records were not adequately audited. The Magistrate finds that Plaintiffs' allegations are not supported by the record. *See, e.g.,* Defendants' Appendix to its brief in support of its motion for summary judgment, Tab 16, pgs. 4, 16, 22; Tab 17, pgs. 4, 16, 22 (reflecting verified auditors' reports for relevant fiscal years, including legislative advocacy and assistance records); Defendant Smay's Deposition of April 8, 1991 (a deposition the Magistrate personally supervised for approximately six hours); Edgar Lien's Deposition of August 30, 1989; Edgar Lien's Deposition of April 1992.

In any event, even if Plaintiffs' allegations with regard to Defendants' legislative activities were taken as true, the activities occurred before *Keller* clearly established that the First Amendment restricted an integrated bar's use of mandatory dues. Accordingly, it is the report and recommendation of the Magistrate that Defendants' motion for summary judgment as to Plaintiffs' claims for compensatory and punitive damages be granted based upon qualified immunity.[6]

## II. Prospective Relief

The parties to this cause of action have informed the court that the Wisconsin State Bar has now, as of July 1, 1992, returned to a mandatory bar status. The law is clear that a mandatory bar, in and of itself, does not impermissibly infringe upon Plaintiffs' constitutional rights. *Keller v. State Bar of California*, 496 U.S. 1, 7–11, 110 S.Ct. 2228, 2233–34, 110 L.Ed.2d 1 (1990); *Lathrop v. Donohue*, 367 U.S. 820, 843, 81 S.Ct. 1826, 1838, 6 L.Ed.2d 1191 (1961); "[L]awyers admitted to practice in the State may be required to join and pay dues to the State Bar." *Keller*, 496 U.S. at 4, 110 S.Ct. at 2231. Rather, it is the use of the compelled dues of objecting members for ideological activities not germane to regulation of the legal profession or improving the quality of legal services that raises First Amendment concerns. *Keller*, 496 U.S. at 13–15, 110 S.Ct. at 2236. Accordingly, the question before the court becomes the adequacy of the procedure put in place in order to prevent such a use of mandatory dues. *Keller*, 496 U.S. at 15–17, 110 S.Ct. at 2237.

The United States Supreme Court in *Keller* applied the analysis of its union and

---

5. The records were kept on a monthly basis.

6. The Magistrate notes that Plaintiffs have also failed to show that Defendants' conduct warrants the imposition of punitive damages. "A jury may award punitive damages in § 1983 if it finds conduct motivated by evil intent or callous indifference to the federally-protected rights of plaintiffs." *Coulter v. Vitale*, 882 F.2d 1286, 1289 (7th Cir.1989) (citation omitted). The record in this case does not support such a finding.

agency shop cases to the expenditure of mandatory dues in the integrated bar context.[7] The Court held that an integrated bar may collect dues from objecting members for the support of ideological causes not germane to regulation of the legal profession or improving the quality of legal services. *Id.* 496 U.S. at 13–15, 110 S.Ct. at 2236. The Court acknowledged the difficulty in applying this standard[8] and, as such, indicated that an integrated bar can meet its obligation by adopting the type of procedures approved by the Court in the union context.

In *Chicago Teachers Union, Local No. 1 v. Hudson* (hereinafter *"Hudson"*), 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986), the U.S. Supreme Court set forth the minimum constitutional requirements of a procedure by which union members (or, non-union members in an agency shop) could prevent the use of their compelled union dues to finance the non-germane ideological and political expenditures of a union. The Supreme Court reasoned that in order to protect the rights of dissenting union members, a union operating in an agency shop setting must provide procedural safeguards to prevent "compulsory subsidization of ideological activity by employ-

ees who object thereto without restricting the Union's ability to require every employee to contribute to the cost of collective-bargaining activities." *Id.* at 302, 106 S.Ct. at 1073. Accordingly, the Supreme Court set forth the following safeguards: (1) an adequate explanation of the fee to potential objectors must be given before collection of the fee; (2) a reasonably prompt decision by an impartial decisionmaker on any objections to the amount of the fee must be provided; and (3) a procedure whereby amounts reasonably in dispute are not used by the union, even temporarily, for an improper purpose must be developed (for example, an escrow account). *Id.* at 305–310, 106 S.Ct. at 1075–77. *See, also, Ping v. National Educ. Ass'n,* 870 F.2d 1369, 1372 (7th Cir.1989).

Plaintiffs have filed a second motion for a preliminary injunction apparently seeking to prevent the reintegration of the Wisconsin State Bar under the revised Wisconsin Supreme Court rules and State Bar by-laws governing legislative activities. The Magistrate views it as appropriate to examine these new rules and by-laws in order to determine if they comport with the minimum requirements set forth in *Hudson.*[9]

---

7. The *Keller* Court noted the "substantial analogy" between the relationship of the State Bar and its members, on the one hand, and the relation of the employee unions and their members, on the other. The Court explained that the reason behind "agency shop" laws is to prevent "free riders"—those individuals who receive the benefits of union negotiation during collective bargaining with their employers, but who do not chose to join the union and pay dues. "Free riders" avoid paying their fair share of the cost of a process that benefits them. State Bar members, on the other hand, concededly do not benefit as directly from State Bar activities as do union members, but "the position of the organized bars has generally been that they prefer a large measure of self-regulation to regulation conducted by a government body which has little or no connection with the profession." The Court concluded that "[i]t is entirely appropriate that all of the lawyers who derive benefit from the unique status of being among those admitted to practice before the courts should be called upon to pay a fair share of the cost of the professional involvement in this effort." 496 U.S. at 12, 110 S.Ct. at 2235.

8. In this regard, the Supreme Court stated:

Precisely where the line falls between those State Bar activities in which the officials and members of the Bar are acting essentially as professional advisors to those ultimately charged with the regulation of the legal profession, on the one hand, and those activities having political or ideological coloration which are not reasonably related to the advancement of such goals, on the other, will not always be easy to discern. But the extreme ends of the spectrum are clear: Compulsory dues may not be expended to endorse or advance a gun control or nuclear weapons freeze initiative; at the other end of the spectrum [Plaintiffs] have no valid constitutional objection to their compulsory dues being spent for activities connected with disciplining members of the bar or proposing ethical codes for the profession.
496 U.S. at 15–17, 110 S.Ct. at 2237.

9. The Magistrate is of the belief that this is a more expedient method of resolving the issues in this case as opposed to determining whether Plaintiffs have satisfied the necessary factors for injunctive relief. The chosen method shows that Plaintiffs cannot meet the first requirement for an injunction to issue, that is, likelihood of success on the merits.

The Magistrate initially notes that the language of the new Wisconsin Supreme Court Rule 10.03(5)(b) quotes the language of *Keller* in defining what activities may be funded with compulsory dues. Specifically, the language reads: "The State Bar may use compulsory dues only for activities reasonably intended for the purpose of regulating the legal profession or improving the quality of legal services offered by members of the State Bar." *See, Keller,* 496 U.S. at 14, 110 S.Ct. at 2236 ("the guiding standard must be whether the challenged expenditures are necessarily or reasonably incurred for the purpose of regulating the legal profession or 'improving the quality of the legal service available to the people of the State' ") (citation omitted). The Magistrate finds that each of *Hudson's* requirements is included in the new procedure.

A. The procedure provides for an adequate explanation of the amount of mandatory dues.

██ The U.S. Supreme Court struck down the dues reduction procedure established by the Chicago Teachers Union in *Hudson* because it, *inter alia,* failed to provide potential objectors with sufficient information about how the union arrived at each union member's proportionate share so that each individual member could gauge the propriety of the fee. *Id.* 475 U.S. at 306, 106 S.Ct. at 1075. The notice provided in *Hudson* simply informed each union member of the amount of the fee. No explanation was given as to how that amount had been calculated. *Id.* at 306–307, 106 S.Ct. at 1075–76.

Although the U.S. Supreme Court found the minimal notice in *Hudson* inadequate, the Court did state that an exhaustive and detailed list of all expenditures is not required. All that need be provided is a list of the major categories of expenditures with verification by an independent auditor. *Id.* at 307 n. 18, 106 S.Ct. at 1076 n. 18. Moreover, the Court recognized that "absolute precision" in the calculation of the union's assessment to dissenting members cannot be expected or required. The Court noted that the union could not "be faulted

for calculating its fee on the basis of expenses during the preceding year." *Id.*

In contrast to the notice provided in *Hudson,* the Wisconsin Supreme Court procedure requires the State Bar to provide written notice to all members before the beginning of each fiscal year. The notice must describe those activities that the State Bar has determined can be supported by compulsory dues and those activities that cannot be supported by compulsory dues. The notice must also inform the members of the cost of each activity and describe how the costs were calculated. The pro rata portion of each activity that cannot be supported by compulsory dues must be stated. A State Bar member may then withhold his or her pro rata share of the dues budgeted for activities that cannot be supported by compulsory dues.

The Magistrate finds that the information required by the Wisconsin Supreme Court rule in this regard clearly meets the first *Hudson* requirement. Rule 10.-03(b)(5)(2) provides details of the activities of the State Bar, each member's pro rata share of each activity and how this share was calculated. The procedure, thus, provides members of the Wisconsin State Bar with sufficient information from which they can gauge the propriety of the pro rata amount. The individual State Bar members may then deduct, if they see fit, the amount for the State Bar's legislative activities that they do not wish to help finance.

B. The procedure provides for a "reasonably prompt" decision on any objections by an impartial decisionmaker.

██ The procedure struck down in *Hudson* was also inadequate because it failed to provide for an impartial adjudication of any objections. The procedure at issue in *Hudson* provided that any objections would be considered only by union officials and an arbitrator selected solely by the union. 475 U.S. at 308, 106 S.Ct. at 1077. The U.S. Supreme Court noted that an expeditious arbitration would satisfy the

requirement of a reasonably prompt decision by an impartial decisionmaker. The arbitrator must not, however, represent the union's unrestricted choice. *Id.* at n. 21.

Wisconsin Supreme Court Rule 10.-03(5)(b)(3)–(5) sets up a procedure whereby those who contend that the calculation as to those activities that cannot be supported by compulsory dues or as to their pro rata share is incorrect may challenge the calculation. The procedure then provides that the challenge will be promptly determined by an impartial arbitrator. Accordingly, the Wisconsin procedure also meet the second requirement of *Hudson.*

C. The procedure prevents the use of the dues of objecting members for an improper purpose.

■ Finally, the U.S. Supreme Court struck down the procedure in *Hudson* because it provided only for a rebate, without interest, of any amounts the arbitrator determined were paid in excess of that which was permissible. *Id.* at 305–306, 106 S.Ct. at 1074–75. In fact, the procedure provided that no objection could even be made until after the first payroll deduction of the fee. The delay involved in objecting and the review process virtually guaranteed that several months' deductions would be made without any decision on the objection. *Id.* at 296, 106 S.Ct. at 1070–71. As a result, although amounts overpaid would eventually be returned to dissenters, the union used the money until ordered to return it. Dissenters' money was, thus, used, at least temporarily, for an improper purpose.

Again, no such problem exists in relation to the Wisconsin procedure. State Bar by-law Article 1, Section 5(b) provides that a member demanding arbitration need not pay any dues until October 31st or 15 days following the arbitrator's decision, whichever is later. This provision obviates the need for an escrow of disputed funds. The Magistrate, therefore, recommends that Plaintiffs' motion for a second preliminary injunction be denied.

■ As to any challenges Plaintiffs may have in relation to the accuracy of the fee calculation for fiscal year 1993, the Magistrate believes such issues are not yet ripe for decision. The dues reduction procedure in place beginning July 1, 1992, specifically incorporates an opportunity to challenge the fee calculation before an impartial decisionmaker. Such a provision, as previously stated, is required by *Hudson.* The Seventh Circuit Court of Appeals has also already ruled that dissenters must avail themselves of that procedure before bringing their complaints to court. *Hudson v. Chicago Teachers Union, Local No. 1,* 922 F.2d 1306, 1314 (7th Cir.), *cert. denied,* — U.S. ——, 111 S.Ct. 2852, 115 L.Ed.2d 1020 (1991). This court refuses to take part in the business of micro-managing bar associations.

## CONCLUSION

The time has come to put this matter to a close. The record in this case shows that numerous steps were taken by both the Wisconsin Supreme Court and Defendants since the inception of the integrated bar in Wisconsin to ensure compliance with existing State and Federal law. Accordingly, the Magistrate recommends that Defendants' motion for summary judgment based upon qualified immunity be granted.

Additionally, the Magistrate recommends that Plaintiffs' second motion for a preliminary injunction be denied. The procedures in place in relation to Wisconsin's mandatory bar requirements and dues reduction for legislative activities clearly comport with the United States Supreme Court's requirements set forth in *Hudson.* All other motions pending in this case are rendered moot. This cause of action, in the Magistrate's opinion should, therefore, be dismissed.

Parties are given ten days from the date of receipt of this opinion to appeal the Magistrate's recommendation to Judge Stanley J. Roszkowski. The Magistrate recommends that Judge Roszkowski limit the parties to 15 pages of argument each. No further briefs should be permitted unless the court so directs, including letters to the court. The record in this case is

ample enough to decide the issues set forth by the parties to this cause of action.

Date: Aug. 24, 1992.